ROCKY LEE STEPHENSON, PLAINTIFF-RESPONDENT, v. R.A. JONES & CO., INC., A FOREIGN CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT, v. SUNSHINE BISCUITS, INC., THIRD-PARTY DEFENDANT-RESPONDENT.

Argued November 18, 1985—Decided July 8, 1986.

*Richard A. Tanner* argued the cause for appellant (*Haggerty & Donohue,* attorneys).

*Clarkson S. Fisher, Jr.* argued the cause for respondent Sunshine Biscuits, Inc. (*Evans, Koelzer, Osborne & Kreizman,* attorneys).

*Benjamin D. Leibowitz* argued the cause for respondent Rocky Lee Stephenson (*Baer and Arbeiter,* attorneys).

*Frank L. Bate* submitted a brief on behalf of *amicus curiae,* Packaging Machinery Manufacturers Institute (*Shanley & Fisher,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Like the companion case, *Ramos v. Browning Ferris Industries, Inc. of South Jersey, Inc.,* 103 *N.J.* 177 (1986), this case requires us to consider the interaction between the exclusive-remedy provisions of the Workers' Compensation Act and an employer's liability to a third-party tortfeasor for injuries to an employee.

Plaintiff, Rocky Lee Stephenson (now O'Briant), was seriously injured in the course of her employment with Sunshine Biscuits, Inc. (Sunshine), while operating a cartoning machine manufactured by R.A. Jones & Co., Inc. (Jones). She recovered workers' compensation against Sunshine and instituted this suit against Jones. Jones answered the complaint and filed a third-party complaint against Sunshine, seeking contribution or implied indemnification. The Law Division granted Sunshine's motion for summary judgment dismissing the third-party complaint, and the Appellate Division affirmed in an unreported opinion.

We granted certification, 101 *N.J.* 238 (1985), and now affirm the judgment of the Appellate Division.

For the reasons set forth in *Ramos,* we find that Jones has no claim for contribution or indemnity against Sunshine that can override the exclusive-remedy provision of the Workers' Compensation Act.

–I–

In 1970, Jones manufactured and sold to Sunshine several cartoners, machines that fold and assemble pre-cut cardboard into boxes, while also loading the boxes with food products. Sunshine purchased the subject cartoner for use in its Dayton, Ohio plant, and in 1973 moved the cartoner to its plant in Sayreville, New Jersey.

In 1974, after receiving reports of injuries caused by the rotating flap-separator pin on the cartoner, Jones immediately designed a guard called a ball-detent unit. By December 1974, Jones wrote letters to all cartoner owners advising them of the prior accidents and that it would send them the new guard. Jones sent twelve guards to Sunshine, including three for the machines in Sayreville, but made no other efforts at that time to ensure that the guards were installed. Although Jones offered evidence of shipment of the guards to the Sayreville plant, it could not prove that Sunshine received them. Sunshine installed the new guards at its other plants, but not at its Sayreville plant.

Between 1974 and 1980, Jones's representative made regular maintenance visits to the Sayreville plant. It was not until May 1980, however, that a Jones representative noticed that the ball-detent units had not been installed. Although Jones promptly wrote a letter urging Sunshine to install the guards, Jones did not itself offer to install them. At no time did Sunshine deny Jones access to the plant or prevent Jones from installing the guards.

In July 1980, O'Briant, who was wearing an elastic bandage for a wrist sprain she sustained when she slipped earlier in the day, was working with the cartoner. The cartoner jammed, and O'Briant's bandage became caught in the machine. Her hand was drawn into the machine and severely injured.

After recovering a workers' compensation award, O'Briant sued Jones for negligence, strict liability, and breach of warranty. Jones filed a third-party complaint against Sunshine and its

workers' compensation carrier, Continental Insurance Company, for contribution or implied indemnity based on Sunshine's persistent failure to install the guards. Relying on the exclusive-remedy provisions of the workers' compensation law, Sunshine moved to dismiss the third-party complaint. The trial court granted Sunshine's motion for summary judgment, and Jones dismissed the claim against Continental.

O'Briant's claim against Jones proceeded to trial, and the court ruled as a matter of law that Jones had a duty to install the ball-detent unit, that it had breached its duty, and that the breach was a proximate cause of the accident. Jones has not challenged that ruling on appeal. *See Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 400 (1982) (machine builder cannot escape liability by relying on owner-employer to install safety devices).

The jury awarded O'Briant damages of $100,000. At Jones's request, the court then submitted a special interrogatory to the jury asking it to apportion the relative negligence of Jones and Sunshine under the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3. The jury found that Jones was 5 percent negligent and Sunshine 95 percent negligent.

In an unpublished opinion, the Appellate Division affirmed the trial court's denial of contribution or indemnification. The court found that the exclusive-remedy provisions of the Workers' Compensation Act barred Jones's demand for contribution. Furthermore, the court found no special relationship existed between Jones and Sunshine, and that even if such a relationship existed, Jones, which had been found to be at fault, was not entitled to indemnification. The Appellate Division also rejected Jones's contention, which was not raised before the Law Division, that the failure to grant contribution or indemnification would constitute a violation of substantive due process. *See Arcell v. Ashland Chem. Co., Inc.*, 152 *N.J.Super.* 471 (Law Div.1977).

–II–

As explained in *Ramos, supra,* 103 *N.J.* at 183–185, and employer is not liable in tort to an injured employee and cannot be considered a joint tortfeasor. Therefore, Sunshine is not obligated to Jones under the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–3, or the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.3.

Recognizing that Sunshine had not expressly agreed to indemnify it, Jones limits its claim to one for implied indemnification. This claim likewise fails both because the jury found Jones to be at fault, albeit only to the extent of 5%, and because Jones's relationship to Sunshine as a vendor will not support a claim for implied indemnity. *See Ramos, supra,* 103 *N.J.* at 188–191. Given the jury's finding that Jones's negligence is less than that of Sunshine, the effect of the legislative scheme may seem harsh. But we cannot distinguish in principle between a third-party tortfeasor that is 5 percent negligent and one that is 95 percent negligent. In both instances, the tortfeasor is liable in tort to the injured worker because of his wrongful conduct. By comparison, the Workers' Compensation Act provides the exclusive remedy against an employer whose concurring negligence contributes to the injury of an employee. To permit the third-party tortfeasor to recover indemnification from the employer would subvert the immunity granted to the employer by the Act. *Ramos, supra,* 103 *N.J.* at 189–190.

The dissent concludes that Jones's claim for indemnification from Sunshine should not have been dismissed as a matter of law, but should have been submitted to the jury. In reaching that conclusion, the dissent proceeds from a flawed analysis of the facts and law. The factual predicate of the dissent is the characterization of Sunshine as an employer that persistently frustrated Jones's efforts to correct the defects in its cartoner. 100 *N.J.* at 201. Nothing in the record justifies that characterization. Assuming that Jones sent the unit to the Sayreville plant, Sunshine's failure to install the unit does not bespeak

frustration of Jones's efforts to correct the defects in its machines. It may bespeak negligence on the part of Sunshine, but that is the kind of conduct that is immunized by the Workers' Compensation Act.

The flaw in the dissent's legal analysis is the notion that even a manufacturer that is primarily liable in tort to an employee may recover indemnification from the employer as long as a special relationship exists between the third party and the employer. A special relationship alone, however, is not sufficient to require an employer to indemnify a third-party manufacturer. To recover indemnification from an employer, a third party must be secondarily or vicariously liable, not personally at fault. *Arcell v. Ashland Chem. Co., Inc., supra,* 152 *N.J.Super.* at 489. Thus, an employer may have an implied duty to indemnify a third party "when a special legal relationship exists between the employer and the third party, and the liability of the third party is vicarious." *Ramos, supra,* 103 *N.J.* at 189. A manufacturer that knows its machines are defective has a duty to employees of the purchaser to correct the defect and may not rely on the purchaser-employer to make the necessary correction. *Michalko v. Cooke Color & Chem. Corp., supra,* 91 *N.J.* at 400. Knowing that its machines were injuring workers at other locations, Jones merely sent Sunshine a letter and a guard. Jones was legally obligated to do more to discharge its duty to the workers who used its machines. By not appealing the judgment that the defect in its machine was a proximate cause of the accident, Jones is bound by the finding that it is primarily liable for Stephenson's injuries. The argument that the dissent espouses, that the employer should indemnify the manufacturer of a defective machine that injures an employee when the employer persistently frustrates the manufacturer's efforts to correct the defect, is not before us.

In its petition for certification, Jones raises the question "whether the New Jersey comparative negligence law violates substantive due process rights of certain litigants." The peti-

tion, however, does not discuss the point or cite any supporting authorities. Nor did Jones press the point at oral argument. Based on that presentation, we are unable to find any merit to the argument. *Cf. Arcell v. Ashland Chem. Co., Inc., supra,* 152 *N.J.Super.* at 501–03 (inability of third-party tortfeasor to recover contribution or implied indemnification against employer does not constitute violation of substantive due process).

The judgment of the Appellate Division is affirmed.

STEIN, J., dissenting.

The significant legal issue in this case is whether an employer who persistently frustrates a manufacturer's efforts to correct a dangerous condition in a machine can be required to indemnify the manufacturer for damages paid to an employee injured by the very hazard that the employer prevented the manufacturer from repairing. The majority opinion in this case, read in conjunction with the opinion in the companion case of *Ramos v. Browning Ferris Indus. of South Jersey, Inc. and Laminating Corp. of America,* which we also decide today, 103 *N.J.* 177 (1986), concludes that the Workers' Compensation Act immunizes from such an indemnity claim an employer who refuses to correct a machine defect after notice of the defect and delivery of a safety device by the machine manufacturer. I dissent because I believe the majority has extended the employer's immunity beyond the Legislature's intended purpose in adopting the Workers' Compensation Act.

I

In 1970, R.A. Jones & Co., Inc. (Jones) manufactured and sold to Sunshine Biscuits, Inc. (Sunshine) a Jones CMH [1] cartoner for use by Sunshine at its Dayton, Ohio plant. The machine's

---

[1]The designation CMH signifies a continuous motion horizontal movement cartoning machine that takes stacks of flat pre-formed cardboard and, by folding and gluing, assembles them into boxes, while simultaneously feeding final products into these boxes for packaging.

function was to assemble and load cartons with food products. In 1973 Sunshine moved the cartoner to its Sayreville, New Jersey plant.

Jones learned in 1974 that an employee of another cartoner customer had sustained injuries when the sleeve of her dress caught on the cartoner's "rotating flap separator pin," a machine part powered by a drive shaft and instrumental in the machine's carton assembly function. In response to the accident Jones designed a guard called a "ball detent unit," which functioned by disengaging the rotating flap separator pins from their drive mechanism whenever the pins encountered undue resistance. Installation of the guard would prevent injury to an operator whose hands were placed in the area of the flap separator pins. The cost of the ball detent guard was $300.[2] It could be installed in thirty minutes or less at a minimal labor cost.

In December 1974, Jones sent letters to the 86 owners of its cartoning machines. The letter informed the machine owners of the nature of the accident that prompted the design of the ball detent guard. The letter concluded with a request that each customer install the guard, which was being forwarded at no cost:

> Rather than offer it for sale as a new feature to you and our other customers, this letter will advise you that this device, together with instructions for installation, are now on their way to you at no charge.
>
> We trust that you will insist upon its installation as it should afford even greater safety for your employees and we would appreciate it if someone from your company would be kind enough to acknowledge receipt of the parts.

In January 1975, Jones shipped the 86 ball detent guards to its customers. Included in the shipment were 12 guards sent to Sunshine plants in various locations, three of which were for use at the Sayreville plant. At trial, Jones offered evidence of

---

[2]The cost to Sunshine of the cartoner machine was estimated at $65,000–$75,000.

shipment of the guards to the Sayreville plant, but was unable to prove receipt.

Although the guards were installed by Sunshine at some, if not all, of their other plants, they were not installed on the cartoners in the Sayreville plant. In May 1980, during a plant visit, a Jones representative learned that the safety devices had never been installed. Jones then renewed its efforts to have Sunshine install the guards on its cartoning machines. In early May, Jones' regional sales manager wrote to Gene Spiegle, Sunshine's Director of Engineering, to advise him that the ball detent guards had not been installed on the three cartoners at the Sayreville plant. On May 22, Jones' executive vice president wrote Mr. Spiegle to inform him of the date on which the safety devices had been sent to Sayreville. Because Sunshine's personnel were having difficulty locating the guards, the letter concluded with an offer of replacements:

> It is most important that these safety features be installed. If you are unable to locate them we can furnish replacements for which there would be a charge.

On May 29, Jones' sales manager wrote to Spiegle listing the dates on which cartoner safety guards had been sent to all Sunshine plants throughout the country. On June 13, Jones sent Spiegle a blueprint showing the detailed design of the safety guard and offering Sunshine additional assistance if needed. A Jones engineer testified at trial that Jones personnel would have installed the cartoner safety guards if requested by Sunshine.

On July 7, plaintiff was seriously injured when an ace bandage on her wrist was caught by the rotating flap separator pins, pulling her hand into the machinery. At trial, Jones produced an engineering expert who testified that plaintiff's injuries were unlikely to have occurred if the ball detent safety device had been installed on the machine.

Jones also offered testimony from Sunshine's "safety coordinator" who investigated the cause of plaintiff's accident. Her accident report confirmed that all Sunshine plant engineers

were told in 1974 of the need to install ball detent clutches on Jones cartoning machines, but that the maintenance department was unable to find the safety devices in the plant. She also testified that installation of the ball detent devices was required by the Occupational Health and Safety Act (OSHA). 29 *U.S. C.A.* §§ 651–78 (West 1985). On her recommendation, Sunshine ordered additional ball detent clutch devices from Jones on August 5, 1980.

As the majority opinion indicates, the trial court ruled that Jones was liable to plaintiff as a matter of law, and the jury awarded plaintiff damages of $100,000. Jones' third-party complaint for indemnification against Sunshine was dismissed by the trial court on the basis of the exclusive remedy provisions of the workers' compensation law. In response to a special interrogatory submitted to the jury at Jones' request, the jury found that Jones was five percent negligent and Sunshine ninety-five percent. The Appellate Division affirmed in an unreported opinion.

## II

The employer's immunity under workers' compensation statutes has been a barrier to innumerable attempts by defendants, in litigation instituted by injured employees, to recover all or part of their liability for damages from the employer whose negligence contributed to the injury. The majority opinion in *Ramos* acknowledges that the question is "perhaps the most evenly-balanced controversy in all of compensation law." *Ramos, supra*, 103 *N.J.* at 185 (quoting 2A Larson, *Workmen's Compensation Law* § 76.11 at 14–561 (1983) (hereafter 2A Larson)). Although the question may be evenly balanced, its disposition throughout the country has been heavily weighted in favor of the employer's immunity. For a collection of the federal and state cases, see 2A Larson, § 76.20 at 14–571 to –594 n. 24. *See generally* Larson, "Third-Party Action Over Against Workers' Compensation Employer," 1982 *Duke L.J.*

483 (hereafter Larson, "Third-Party Action"); Comment, "The Effect of Workers' Compensation Laws on the Right of a Third Party Liable to an Injured Employee to Recover Contribution or Indemnity from the Employer," 9 *Seton Hall L.Rev.* 238 (1978); Annot., 100 *A.L.R.*3d 350 (1980).

Our cases, consistent with the majority rule, have steadfastly refused to erode the employer's immunity when the claim for contribution is based on the employer's concurrent negligence. *Schweizer v. Elox Div. of Colt Indus.*, 70 *N.J.* 280 (1976); *Arcell v. Ashland Chem. Co., Inc.*, 152 *N.J.Super.* 471 (Law Div.1977); *Ruvolo v. U.S. Steel Corp.*, 139 *N.J.Super.* 578 (Law Div.1976); *Marshall v. Force Mach. Co.*, 123 *N.J.Super.* 497 (Law Div.1973).

The vast number of reported decisions throughout the country involving attempts by defendants, in connection with suits by employees of others, to sidestep, dilute, or avoid the employer's workers' compensation immunity, creates the impression that the issue posed by *this* case has already been debated and decided. However, on close examination it is evident that the question of extending workers' compensation immunity to an employer who refuses to install a safety device sent by a manufacturer to repair a design defect in the employer's machine is one of first impression in New Jersey, and virtually without precedent in other jurisdictions.

The majority's opinion in *Ramos* recounts and rejects some of the various attempts by other jurisdictions to compromise the sometimes harsh effects of the employer's immunity. 103 *N.J.* at 185–188. The diverse state doctrines that permit direct or indirect recovery of contribution from a concurrently negligent employer are described in Larson, "Third-Party Action," *supra,* at 491–500: the former "Pennsylvania Rule" (contribution by employer permissible because contribution between joint tort-

feasors depends on joint *negligence* rather than joint liability); [3] the Minnesota Rule in *Lambertson* [4] (contribution by employer permitted in proportion to fault but not in excess of workers' compensation liability); the California and North Carolina approach (where employer's negligence contributed to the injury, the employee's third-party recovery is reduced by the amount of the compensation award); [5] the "Murray Credit" rule (employee's judgment against third party tortfeasor should be reduced by employer's *pro rata* share after employee's recovery against employer under workers' compensation act); [6] the New York rule in *Dole* (employer required to indemnify third-party tortfeasor based on employer's degree of fault in causing employee's injury); [7] and the Illinois rule in *Skinner* (employer liable for contribution based on degree of fault and amount of contribution not limited by employer's obligation under worker's compensation law).[8] These creative encroachments on the employer's workers' compensation immunity are generally criticized by commentators because they seek indirectly to impose liability on the employer for concurrent negligence that contributes to the employee's injury, a result that most legislatures

---

[3]*See* Elston v. Indus. Lift Truck Co., *420* Pa. *97, 102 n. 2, 216* A.2d *318, 320 n. 2 (1966). The rule was repudiated by the 1974 amendment to § 303(b) of the Pennsylvania Workmen's Compensation Act.* Pa.Stat.Ann. *tit. 77, § 481(b) (Purdon Supp.1981).*

[4]*Lambertson v. Cincinnati Corp., 312 Minn.* 114, 257 *N.W.*2d 679 (1977).

[5]*Tate* v. Superior Court of Los Angeles, *213* Cal.App.*2d 238, 28* Cal.Rptr. *548 (Cal.App.1963);* Hunsucker v. High Point Bending & Chair Co., *237* N.C. *559, 75* S.E.*2d 768 (1953).*

[6]*Murray* v. United States, *405* F.*2d 1361 (D.C.Cir.1968).*

[7]*Dole* v. Dow Chem. Co., *30* N.Y.*2d 143, 282* N.E.*2d 288, 331* N.Y.S.*2d 382 (1972).*

[8]*Skinner* v. Reed-Prentice Div. Package Mach. Co., *70* Ill.*2d 1, 15* Ill.Dec. *829, 374* N.E.*2d 437,* cert. *denied, 436* U.S. *946, 98* S.Ct. *2849, 56* L.Ed.*2d 787 (1978). The* Skinner *decision was subsequently overridden by statute.* Ill.Rev.Stat. *ch. 70, § 302 (1979);* see *Larson, "Third-Party Action," supra at 499–500.*

have sought to foreclose by the grant of employer immunity in workers' compensation acts. This view is reflected by Professor Larson's observation that "[i]f products liability law has got out of hand, the necessary corrections should be made within the boundaries of products liability law; they should not be made by distorting long-standing compensation principles completely out of shape." Larson, "Third-Party Action," *supra* at 541.

However, when the third party seeks indemnity from the employer based upon an independent duty that is extricable from the tortious conduct that caused the injury, the clash with the employer's compensation immunity is theoretically less direct. If the employer's independent duty is expressed in a contract, there is general agreement that the third-party indemnity claim is outside the boundaries of the employer's immunity. *See* Larson, "Third-Party Action," *supra* at 500 and cases cited at n. 79. Accordingly, if Jones had inserted in its sales agreement with Sunshine the requirement that Sunshine promptly install on its cartoner machines safety modifications furnished without charge by Jones, the Jones indemnity claim against Sunshine would have been sustained. The majority's opinion in *Ramos* acknowledges that an employer's express agreement to indemnify a third-party tortfeasor does not undermine the exclusive remedy provision of our Workers' Compensation Act. 103 *N.J.* at 191.

Although the right to indemnity becomes more difficult to define when the employer's independent duty is not explicitly contractual, its recognition involves no more conflict with the workers' compensation immunity than does the express indemnity agreement. The critical issue is whether the employer has an independent duty imposed by law rather than by contract. Implied indemnity is essentially an equitable remedy that may "arise without agreement, and by operation of law to prevent a result which is regarded as unjust or unsatisfactory." W. Prosser & W.P. Keeton, *The Law of Torts*, § 51 at 341 (5th ed. 1984).

One context in which implied indemnity is traditionally recognized is when one "is compelled to pay for another's wrong." *Cacioppo v. The Boeing Co.,* 153 *N.J.Super.* 355, 360 (Law Div.1977) (quoting *Taft v. Shaffer Trucking, Inc.,* 52 *A.D.*2d 255, 255, 383 *N.Y.S.*2d 744, 746 (1976)). A party may be compelled to pay for another's wrong when the law imposes upon him absolute or vicarious liability for certain injuries to third parties. The leading New Jersey case is *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.,* 32 *N.J.* 55 (1960). In that case, Gaseteria, the owner of an airplane, was held by statute to be absolutely liable for all damage resulting from the collision of the airplane with a radio tower owned by RKO. The court held that if Gaseteria could prove that the collision was actually the fault of RKO, it was entitled to be indemnified by RKO for all sums paid out to those injured by the collision. *Id.* at 79–81. The Court in *Adler* rejected the proposition, accepted in some other jurisdictions, that a "passive" tortfeasor is entitled to indemnification from an "active" tortfeasor. *Id.* at 81. On this point New Jersey follows the formula of the Restatement of Restitution:

> A person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability. [*Restatement, Restitution,* § 96 (1937).]

Thus the New Jersey rule is that to recover in implied indemnity on the theory that the other party was the one "really" at fault, a claimant must not have been at fault himself. *See Cartel Capital Corp. v. Fireco of New Jersey,* 81 *N.J.* 548, 565–66 (1980); *Schramm v. Arsenal Esso Station,* 124 *N.J.Super.* 135, 138–39 (App.Div.), aff'd, 63 *N.J.* 593 (1973); *Public Service Elec. & Gas Co. v. Waldroup,* 38 *N.J.Super.* 419, 432 (App.Div.1955); *Cacioppo v. The Boeing Co., supra,* 153 *N.J. Super.* at 359–60.

However, vicarious liability for the fault of another is not the only circumstance that can give rise to a duty of indemnification. Another ground for implied indemnity occurs when two parties "stand in a special legal relationship that carries with it

the obligation * * * to indemnify." Larson, "Third-Party Action," *supra* at 505–06. The significant feature of this ground for indemnity, as contrasted with indemnity based on vicarious liability, is that the party claiming a right of indemnification need not be totally free of fault. The right to indemnity is based instead on the equities of an ongoing relationship. As Professor Leflar noted, "it is the fact situation in its entirety, consensual and non-consensual elements both included, which gives rise to the obligation to indemnify." "Contribution and Indemnity Between Tortfeasors," 81 *U.Pa.L.Rev.* 130, 147 (1932).

Perhaps the most common example of a special legal relationship that gives rise to an implied right of indemnification is the relationship of principal to agent. When an agent commits a tort in good faith reliance on the directions of his principal, the agent is entitled to indemnification from the principal for his liability to an injured third party. *See Restatement, Restitution* § 90 (1937). The case of *Hagen v. Koerner*, 64 *N.J.Super.* 580 (App.Div.1960), illustrates this form of implied indemnity in the workers' compensation context. In that case, decided before New Jersey conferred immunity on co-employees, a deceased employee's widow instituted a wrongful death action against one of her husband's co-workers. The defendant impleaded the employer, but the trial court dismissed the third-party complaint because of the employer's presumed immunity. The Appellate Division reversed, holding that the employer's workers' compensation immunity could not override the employer's implied obligation to indemnify his employee for liability arising out of his employment. The court noted that the co-employee's negligence would not bar his claim to indemnity if he was "doing in good faith what he was specifically instructed to do by the employer." *Id.* at 588. Recognizing the potential for conflict with the employer's immunity under the workers' compensation law, the court held:

> More unjustifiable than extending the employer's liability, by express or implied agreement to indemnify, beyond his responsibility under the Workmen's Com-

pensation Law, would be the anomalous result of requiring the co-employee to shoulder the employer's obligation because he was obedient to his employer's instructions. [*Id.*]

The relationship of bailee-bailor has also been held to create an implied obligation of indemnity. This principle is illustrated by *Baugh v. Rogers*, 24 *Cal.*2d 200, 148 *P.*2d 633 (1944). There the employer, driving a third party's car, ran into his own employee, who then sued the third party under an owner's liability statute. The third party successfully sought indemnity from the employer, whose implied obligation to hold the bailor harmless was held to supersede his workers' compensation immunity. *Id.* at 214–16, 148 *P.*2d at 641–42. That case recognized, as do most "special relationship" cases, the existence of a duty owed by the employer-bailee to the third party-bailor that was distinct from the duty of care owed to the employee. The decision turned not on the owner's lack of personal fault with respect to the injured employee, but on "the independent and correlative rights and obligations of the owner and of the operator as between them." *Id.* at 215, 148 *P.*2d at 642.

Another relationship that has prompted some courts to impose on employers the implied obligation to indemnify the third party is that in which the third party had hired the employer to perform a service. The best known case is *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 *U.S.* 124, 76 *S.Ct.* 232, 100 *L.Ed.* 133 (1956).[9] There, the Supreme Court held that a shipowner, liable without fault to a longshoreman for "unseaworthiness," had an implied indemnity claim against the longshoreman's employer that overrode the employer's workers' compensation immunity. In justifying the shipowner's recovery against the employer, the majority observed:

The shipowner's action here is not founded upon a tort or upon any duty which the stevedoring contractor owes to its employee. The third-party com-

---

[9]This case was first affirmed by an equally divided court. 349 *U.S.* 901, 75 *S.Ct.* 575, 99 *L.Ed.* 1239 (1955). It was then reargued and affirmed by a 5–4 vote.

plaint is grounded upon the contractor's breach of its purely consensual obligation *owing to the shipowner* to stow the cargo in a reasonably safe manner. Accordingly, the shipowner's action for indemnity on that basis is not barred by the Compensation Act. [*Id.* at 131–32, 76 *S.Ct.* at 236, 100 *L.Ed.* at 141.]

Although the holding in *Ryan* was abrogated by the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act,[10] *Ryan* has been cited frequently in non-longshoreman cases in which the employer's workers' compensation immunity is interposed as a bar to claims for implied indemnity. Larson, "Third-Party Action," *supra* at 526; *see generally* 2A Larson, *supra,* §§ 76.60–76.63.

The various theories of implied indemnity are analytically distinct.[11] This can be made clear by comparing *Adler's Quality Bakery, Inc. v. Gaseteria, supra,* 32 *N.J.* 55, with *Hagen v. Koerner, supra,* 64 *N.J.Super.* 580. In *Adler* the airplane owner, Gaseteria, was held entitled to indemnification from the radio tower owner, RKO, so long as Gaseteria could prove the fault was entirely RKO's. No special legal relationship existed between them—their only connection arose from the collision. In *Hagen,* the employee seeking indemnification was not required to prove that he was without fault. His liability to the plaintiff was direct, not vicarious. The employee's right to indemnification was based entirely on his special relationship with his employer.

[10] 33 *U.S.C.* § 905(b) (1976), as amended by Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, § 18(a), 86 Stat. 1263.

[11] Vicarious liability created by the fault of another and a "special legal relationship" may coexist. As Professor Larson notes, bailment cases often present, "in addition to the special legal relations flowing from the concept of bailment, an extreme contrast between genuine negligence in one party and the most technical and constructive sort of imputed negligence in the other." "Third-Party Action," *supra* at 506. This is probably the case in *Baugh v. Rogers, supra,* 24 *Cal.*2d 200, 148 *P.*2d 633, in which the owner's liability was imposed by statute without proof of fault.

That these two grounds for implied indemnity are distinct is clearly recognized in *Arcell v. Ashland Chemical Co., Inc., supra,* 152 *N.J.Super.* at 488–89. In stating that a liable third party is generally not entitled to indemnification from an employer, the court noted that "[o]ne recognized exception to this rule appears where there is a 'special legal relationship.'" *Id.* at 489 (citing *Hagen v. Koerner, supra,* 64 *N.J.Super.* 580). The court in *Arcell* concluded that, *absent* a special legal relationship, the law in New Jersey requires that the party seeking indemnification be free from fault:

> The rationale for this rule is that in the absence of a special legal relationship a claim for implied indemnification is necessarily based on the theory that both parties are jointly liable for the injury, with the employer's negligence being greater in degree or more culpable than that of the third party. However, recovery on such a theory is contrary to the exclusivity provision of the Workers' Compensation Act since it would amount to holding the employer liable to the employee on account of the employer's negligence. [*Id.*]

The majority opinion rejects out-of-hand the indemnity claim at issue based on its conclusion in *Ramos* that implied indemnity may arise "only when a special legal relationship exists between the employer and the third party, *and* the liability of the third party is vicarious." 103 *N.J.* at 189 (emphasis added). However, if a special legal relationship exists, the liability of the third party need *not* be vicarious for the third party to succeed in its claim for indemnity.[12] Accordingly, notwithstanding the majority's focus on Jones' fault, the decisive issue is whether the relationship between Sunshine and Jones imposed on Sunshine a cognizable duty to allow Jones to fix the defective machine.

The majority's alternate ground for rejecting the indemnity claim—that "the relationship between vendor and vendee will

---

[12]The suggestion that slight fault necessarily precludes indemnification in all fact situations has been discredited as "ancient" and "specious." W. Prosser & W.P. Keeton, *supra,* § 51 at 341.

not support a claim for implied indemnification" [13]—characterizes too generally the transaction between Jones and Sunshine and understates the essence of the factual events that support the indemnity claim. As Professor Davis has noted, "the truth of the matter is that no mere word formula can be a satisfactory test on which to base all decisions as to whether or not indemnity should be awarded." "Indemnity Between Negligent Tortfeasors: A Proposed Rationale," 37 *Iowa L.Rev.* 517, 544 (1952). Other courts, according recognition to facts that supplement the vendor-vendee relationship, have permitted a machine vendor to recover indemnity from the employer-vendee, notwithstanding the employer's reliance on its workers' compensation immunity.

In *Roy v. Star Chopper Co., Inc.,* 442 *F.Supp.* 1010 (D.R.I. 1977), aff'd, 584 *F.*2d 1124 (1st Cir.1978), *cert.* denied, 440 *U.S.* 916, 99 *S.Ct.* 1234, 59 *L.Ed.*2d 466 (1979), plaintiff sought damages based on strict products liability for injuries sustained while operating a machine manufactured by Star Chopper for plaintiff's employer, Advanced Material Systems, Inc. (AMS). Star Chopper impleaded AMS claiming indemnity for any liability imposed against it. The machine purchased by AMS was a "take-up" device involving two rollers that pulled metal strips through a series of metal plating tanks and tank-like enclosures. Star Chopper's indemnity claim was based in part on its contention that AMS was exclusively responsible for the design of the machine that caused plaintiff's injuries. The testimony of Star Chopper's owner indicated that the drawings provided by AMS omitted safety devices and that in response to inquiries, AMS advised Star Chopper that it would add the necessary safety guards.[14] That testimony also indicated that

---

[13]*Ramos* v. Browning Ferris Indus. of South Jersey, Inc. and Laminating Corp. of America, supra, 103 N.J. *at* 189.

[14]Star Chopper's owner testified that in order to install effective safety devices it was necessary to know the exact angle at which the metal strips

AMS was responsible for assembling the plating unit, of which the machine formed a part. The court first observed that the mere fact of the vendor-vendee relationship did not give rise to an implied obligation of indemnity since that would amount to "reversing the strict products liability imposed on a manufacturer for injuries to all users of the product." *Id.* at 1019. The court further held that Star Chopper had a nondelegable duty to make machines that included necessary safety devices, citing *Bexiga v. Havir Mfg. Corp.*, 60 *N.J.* 402 (1972). The court then concluded that the employer's representations that it would install safety devices combined with its responsibility for design and assembly gave rise to an implied obligation to indemnify for injuries resulting from its failure to add the safety devices. Reconciling the indemnity claim both with products liability law and the employer's workers' compensation immunity, the court observed:

At first blush, we appear to be moving in a circle, imposing liability on the manufacturer on the one hand and excusing it on the other through the indemnity contract. However, in fact, the policy of strict liability—to protect users of defective products—is best preserved by this arrangement. Plaintiff Roy still can succeed in strict liability against the manufacturer; the manufacturer is liable for the entire judgment regardless of the indemnity claim. The manufacturer bears the risk and cost of proving the indemnity contract against the employer. The employer, in turn, by expressly undertaking to install safety devices and designing and assembling the machine, has, in effect, waived his immunity under the [worker's compensation] Act for failing to so install. The indemnity claim is based on a contractual undertaking between manufacturer and employer and is independent of the duty owed to the employee. Most importantly, the employer who promises to install safety devices now also has financial impetus over and above compensation liability to carry out its promise. This extra liability is commensurate with the responsibility it assumed over and above that of the ordinary employer. The manufacturer who relies on the employer's promise and the employer making the promise both now have economic reason to guarantee that safety devices are in fact installed. [*Id.* at 1020–21.]

---

entered the rollers of the machine. He testified that AMS refused to provide this information because it did not wish to disclose details of its secret plating process. 442 *F.Supp.* at 1020.

*Cf. Harn v. Standard Eng'g Co.,* 416 *F.Supp.* 1168 (D.S.D. 1976) (claim for indemnity by manufacturer against employer who paid compensation benefits raises issue for jury when manufacturer alleges that employer's alteration of machine caused employee's injury); *United States Fidelity and Guar. Co. v. Kaiser Gypsum Co.,* 273 *Or.* 162, 539 *P.*2d 1065 (1975) (indemnity claim by machine-installer's insurer against injured worker's employer raises jury issue where installer alleged that it removed safety guard at employer's request to permit initial test of machine and employer failed to warn employee of danger in using unguarded machine).[15]

As the *Star Chopper* analysis suggests, our focus here should be to determine if the facts that define the relationship between Jones and Sunshine create a jury question as to whether Sunshine breached an independent duty to Jones, either to install the safety guard on the cartoner machine or permit Jones to install it. Federal and state statutes reflect a strong public policy favoring enhanced workplace safety and support our recognition of an employer's independent obligation to permit a manufacturer to correct a machine defect. The Federal Occupational Safety and Health Act (OSHA), 29 *U.S.C.A.* §§ 651–78 (West 1985), explicitly recognizes the national policy favoring a safe workplace, and § 654 of OSHA requires that employers "furnish to * * * employees * * * a place of employment * * * free from recognized hazards." A "recognized hazard" includes a dangerous condition known to the employer. *See Usery v. Marquette Cement Mfg. Co.,* 568 *F.*2d 902, 909–10 (2nd Cir.1977); *Brennan v. Occupational Safety & Health Review Comm'n,* 494 *F.*2d 460, 463–64 (8th Cir.1974). At trial, Sunshine's safety director testified that OSHA regula-

---

[15]The holding of *Kaiser Gypsum* was overruled by Or.Rev.Stat. § 656.018 (1977). Under the revised statute, neither implied nor express indemnity agreements are enforceable against employers in cases in which liability arises out of compensable injuries to workers. *See Roberts v. Gray's Crane & Rigging,* 73 *Or.App.* 29, 697 *P.*2d 985, 987–88 (Or.App.1985).

tions mandated that its cartoner machines have a safety guard comparable to the ball detent unit designed by Jones.

Similarly, New Jersey's Worker Health and Safety Act, *N.J. S.A.* 34:6A–1 to –24 requires that every employer "shall install, maintain and use such employee protective devices and safeguards * * * as are reasonably necessary to protect the life, health and safety of employees." *N.J.S.A.* 34:6A–3. Moreover, the central focus of this Court's strict products liability decisions has been to minimize accidents by encouraging the optimum investment in safety. "Unquestionably, it is in the public interest to motivate individuals in the context of commercial enterprise to invest in safety." *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 398 (1982); *see Beshada v. Johns-Manville*, 90 *N.J.* 191, 206–07 (1982); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 173–174 (1979).

It is well settled that a manufacturer of a defective product has a continuing duty to protect a purchaser, even where the defect is discovered after the sale. "The duty of a manufacturer to protect the user against an unsafe design may arise even after the purchase, if the danger is then first discovered." W. Prosser, *Handbook of the Law of Torts,* § 96 at 645 (4th ed.); *see Jackson v. New Jersey Mfrs. Ins. Co.,* 166 *N.J.Super.* 448, 466 n. 3 (App.Div.), certif. denied, 81 *N.J.* 330 (1979); *accord, Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 411 *F.*2d 451, 453 (2d Cir.), *cert.* denied, 396 *U.S.* 959, 90 *S.Ct.* 431, 24 *L.Ed.*2d 423 (1969) ("It is clear that after such a product has been sold and dangerous defects in design have come to the manufacturer's attention, the manufacturer has a duty either to remedy these or, if complete remedy is not feasible, at least to give users adequate warnings and instructions concerning methods for minimizing the danger."); *LaBelle v. McCauley Indus. Corp.*, 649 *F.*2d 46 (1st Cir.1981) (failure to warn of need to modify airplane propeller, discovered by manufacturer after sale of propeller, could be found to be negligent); *Kozlowski v. John E. Smith's Sons Co.*, 87 *Wis.*2d 882, 275 *N.W.*2d 915 (1979) (it is a jury question whether, on a theory of strict

liability or negligence, a manufacturer of a sausage-stuffing machine which offered a safety bypass valve as optional equipment from 1946 to 1972, and subsequently made it a standard feature, should be liable for failure to adequately warn or to modify the old sausage stuffer to include the safety valve); *Comstock v. General Motors Corp.*, 358 *Mich.* 163, 99 *N.W.*2d 627 (1959) (manufacturer of automobile with brakes whose future failure could not reasonably have been foreseen had a duty to warn both dealers and drivers of the problems with the brakes after the problem was discovered); 1A Frumer & Friedman, *Products Liability* § 8.02 (continuing duty to warn).

There would be a strange inconsistency in our products liability law were we to impose a duty on manufacturers to correct a defect discovered after sale and simultaneously insulate from liability an employer who refuses to install a safety device provided by the manufacturer to make the machine safe. It is difficult to conceive that the legislative grant of workers' compensation immunity was ever intended to protect from a manufacturer's indemnity claim an employer who prevented the manufacturer from repairing a defective machine. Clearly, our strong public policy favoring workplace safety would be better served by holding that an employer, advised by a manufacturer of a machine defect and offered without cost a safety device to remedy that defect, is not protected from the manufacturer's indemnity claim if the employer wrongfully obstructs the manufacturer's effort to safeguard the machine.[16] The recognition of an employer's independent duty to allow dangerous conditions to be corrected is no more incompatible with the employer's immunity than the acknowledgment of an obligation expressly stated in the employer's agreement with the manufacturer, which even the majority would enforce.

---

[16]Because the employer is entitled to recover its entire workers' compensation payment by way of a lien on the employee's recovery from Jones, *N.J.S.A.* 34:15–40, its economic incentive to allow Jones to make the needed improvements is minimal absent an enforceable claim of indemnity.

Factually, the majority rejects the indemnity claim on the basis that Sunshine did not persistently frustrate Jones' efforts to correct the defect. 103 *N.J.* 199. That issue, however, is for a jury and not for this Court to resolve. The record indicates that Jones acted promptly after it learned of the design defect, designing a protective guard and furnishing it without cost to Sunshine. Sunshine failed to install the guard. After a five-year interval, Jones learned that the guard was not installed and renewed its efforts to cause Sunshine to install it. Sunshine continued to ignore Jones' efforts. Both the plaintiff's injury and Jones' liability to plaintiff would probably have been avoided if the guard had been in place.[17] In my view, these facts clearly raise a jury question as to Jones' right to indemnity from Sunshine.[18]

The majority bars the indemnity claim as a matter of law, relying on Jones' partial fault, the absence of any duty by Sunshine to permit installation of a guard, and Sunshine's workers' compensation immunity. I find none of these grounds for precluding the indemnity claim to be persuasive. Moreover, the majority's unwillingness to recognize that employers who use machines have an enforceable duty to permit defects to be

---

[17]In this case the trial judge directed the jury to return a verdict against Jones on the issue of liability. Other courts confronted with analogous facts have concluded that the machine buyer's failure to install the manufacturer's safety devices could insulate the manufacturer from liability. *See Rekab, Inc. v. Frank Hrubetz & Co., Inc.*, 261 *Md.* 141, 274 *A.2d* 107 (Ct.App.1971) (manufacturer of an amusement park ride held not liable for injuries sustained when ride collapsed, because the manufacturer warned the amusement park of the danger and shipped new parts free of charge to correct the defect); *Gracyalny v. Westinghouse Elec. Corp.*, 723 *F.2d* 1311 (7th Cir.1983) (manufacturer's conduct in warning employer of design defect in circuit breaker and providing replacement parts held to create jury issue as to whether manufacturer's efforts to achieve repair of defect were adequate to insulate the manufacturer from liability).

[18]A jury would also consider the fact that three years after Jones sent out its safety devices, but two years before the accident involving Stephenson, Jones learned of a similar accident at a plant in Georgia. The Georgia plant apparently had also failed to install the ball detent unit sent by Jones.

corrected conflicts directly with our strong policy of enhancing workplace safety and avoiding accidents. I would reverse the judgment dismissing Jones' third-party complaint and remand that issue for trial.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal and remandment*—1.