248 N.J. Super. 446 (1991)
591 A.2d 671
DULIO GRASSIS, ET AL., PLAINTIFFS, AND WILLIAM GASKO AND MARIE GASKO, PLAINTIFFS-APPELLANTS,
v.
JOHNS-MANVILLE CORP., ET AL., DEFENDANTS, AND THE CELOTEX CORPORATION AND GAF CORPORATION, DEFENDANTS-RESPONDENTS CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1991.
Decided May 30, 1991.
*448 Before Judges J.H. COLEMAN, DREIER and LANDAU.
Clifford N. Kuhn, Jr. argued the cause for appellants (Rubin, Rubin, Malgran & Kuhn, attorneys; Clifford N. Kuhn, on the brief).
*449 Gita F. Rothchild argued the cause for respondents/cross-appellants (McCarter & English, attorneys; Michael A. Tanenbaum, of counsel; John C. Garde and Rosanne C. Kemmet, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs William Gasko and Marie Gasko have appealed, and defendants The Celotex Corporation and GAF Corporation were granted leave to cross-appeal. Plaintiffs appeal from the summary judgment dismissing the complaint, and defendants from an earlier grant of remittitur and denial of their motion for judgment n.o.v.
For a 15-year period from 1951 to 1966, plaintiff William Gasko was employed by Goetze Gasket, a Johns-Manville Division. Defendants were manufacturers of asbestos sheets and rolls cut and used by plaintiff in his employment. According to plaintiff there was constant asbestos dust in the air which he inhaled and also ingested. He explained that the employees would eat lunch in the same room in which they worked, where quantities of the dust accumulated. As a result of health problems, he left his employment with Johns-Manville and went to work on a farm he had previously purchased.
During plaintiff's October 1974 hospitalization, his physician discovered colon cancer, and a section of his large intestine was removed. After many follow-up medical visits, there has been no recurrence of the cancer. Plaintiffs' claims for damages included Mr. Gasko's personal discomfort, inability to work, inability to function in a normal capacity and an apprehension concerning the return of the cancer, as well as his wife's claim for loss of consortium.
After the initial trial in this matter, the jury awarded plaintiff $500,000 and his wife $200,000. Defendants immediately *450 sought a new trial or the alternative relief of a remittitur based upon the excessiveness of the verdict. The trial judge found that the damages awarded were excessive and a shock to the court's conscience. He ordered remittitur to the amount of $200,000 for plaintiff and $20,000 for his wife, or in the alternative a new trial on all issues. Plaintiffs rejected the remittitur and the new trial was ordered.[1]
Prior to the commencement of the new trial, defendants moved for summary judgment, contending that plaintiffs' proof of medical causation was legally insufficient. The trial judge had recently concluded two other trials with similar issues, the same attorneys, and in one trial, the same expert witness for plaintiff, Dr. Susan Daum. The argument of counsel at the motion referred principally to Komenda v. Asbestos Corporation Ltd. (L-060683-85), but also to Caterinicchio v. Pittsburgh Corning Corp., recently affirmed in part and reversed in part by this court (A-4706-88T2). The trial court questioned plaintiffs' counsel concerning the possible scope of Dr. Daum's testimony in any retrial of the Gaskos' claims. Plaintiffs' counsel stated that while this was the first colon cancer claim that was being tried, Dr. Daum would testify to the same epidemiological studies as were described in plaintiffs' first trial and in Komenda. The trial judge then stated:
THE COURT: So it seems to me what in effect you're saying, Mr. Kuhn, is that the Court should make a determination and assume that Dr. Daum, if the case is retried, would testify along the same lines and the cross-examination would be along the same lines not as in this particular case but as more extensively done in the Komenda case and perhaps in the Caterinicchio case, but she was not the expert in the Caterinicchio; is that correct, it was another doctor from New York?

*451 [DEFENSE COUNSEL]: I believe that's correct, judge.
THE COURT: All right. In view of that I'm going to grant the motion barring testimony by Dr. Daum on the relationship between the asbestos exposure and the cancer of the colon. I take it then counsel will concede it has no case and 
MR. KUHN: That's correct. There was no other injury.
THE COURT: All right. And based on that representation of counsel then I would grant the motion of summary judgment and now you're in a position to ... go to the appellate division and hopefully they will act quickly and will get this issue resolved as to epidemiological studies.[2]
This case squarely presents for adjudication the standards under which epidemiological evidence can be admitted to support a physician's determination of an environmental factor's causation of a specific medical condition. The difference between this case and other reported opinions on the subject is that the expert here is not only an epidemiologist, but also a medical doctor who purported to relate the epidemiological studies to her medical findings concerning plaintiff. She used both her medical findings and the epidemiological studies to explain her opinion concerning the medically probable causes of plaintiff's condition.[3]
*452 First, we will put aside plaintiffs' objections to the trial judge's decision to grant a new trial. The $700,000 damage award on the facts presented was so grossly disproportionate to the proofs that the trial judge had no choice but to order a new trial. Plaintiffs had presented little more than a summary conclusion that they suffered from Mr. Gasko's illness. Although he feared recurrence of the cancer, there was but brief testimony that plaintiff's abilities were diminished, that he suffered lost wages, and that Mrs. Gasko had suffered loss of consortium. Considering that plaintiff's colon cancer has not returned since its discovery and removal in 1974, the $700,000 award properly was found to shock the judicial conscience.
The real issue in this case is whether the trial judge should have precluded Dr. Daum from testifying if her opinion was based in substantial part upon epidemiological studies *453 which did not show asbestos exposure as having a causative factor in excess of 2.0.[4] In the case before us, although Dr. Daum alluded to other studies (described in the Komenda transcript) where the asbestos-exposure risk factor in the incidence of colon cancer exceeded 2.0, she confirmed that the authoritative studies were generally below the 2.0 level. She even acknowledged (but distinguished) some studies which showed a negative correlation.
As noted in Landrigan, however, epidemiological studies do no more than define risk factors, they do not establish the cause of a disease in a particular person. They also contain inherent anomalies. For example, a particular study might show a high correlation between asbestos and colon cancer, but it also might show a high correlation between the consumption of excessive alcohol and colon cancer. If there were also a very *454 high correlation between those working with asbestos and the high consumption of alcohol, one could not tell whether the alcohol or asbestos or both actually were causative factors of the colon cancer, or even whether the presence of both were needed in order to be a producing factor of the disease. Each study must be analyzed to determine whether the asbestos factor was really isolated. Where, however, study after study has shown some positive correlation, although not to the factor of 2.0, it might be said that asbestos is at least a producing factor in some colon cancers, even if the precise biological process has not yet been defined.
An epidemiologist cannot state that it is more likely than not that a particular case of colon cancer, after asbestos exposure, was caused by the asbestos. Landrigan, 243 N.J. Super. at 462, 579 A.2d 1268. A medical doctor, however, or even one otherwise acquainted with the physiology of a particular patient and the progress of the disease, may make a medical judgment concerning the origin of a disease. See Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 41, 576 A.2d 4 (App.Div. 1990) (now on appeal to the New Jersey Supreme Court). The physician or other such qualified expert may view the epidemiological studies and factor out other known risk factors such as family history, diet, alcohol consumption, smoking (surprisingly, generally recognized as not being a risk in colon cancer, according to the testimony in this case), or other factors which might enhance the remaining recognized risks, even though the risk in the study fell short of the 2.0 correlation.[5]
*455 The interpretation of the data, however, is the function of the qualified expert, and the relationship of the data to the particular case is also a proper subject of expert opinion for the physician or other similarly qualified witness. As noted by the Court in Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 289, 579 A.2d 1241 (1990), courts should be loath to determine whether the particular expert has properly relied upon data which experts in the field generally rely upon.[6] If in the case before us, the trial judge determined that experts in the causation or treatment of disease rely upon epidemiological studies, Dr. Daum should have been permitted to testify respecting the bases for her causation opinion, including the epidemiological studies upon which she relied. Dr. Daum's reliance upon the epidemiological studies in this case should be and was subject to rigorous cross-examination, after which "the weight to be accorded the evidence [should be] left to the determination of the fact-finder." Id. at 288, 579 A.2d 1241.
Defendants argue that there should be a threshold of a 2.0 correlation before an expert should be permitted to rely upon an epidemiological study. They urge that only when this figure is exceeded can it be said that the particular factor is more likely than not to have produced the particular injury. This assertion proves too much. Assuming a large group of potential plaintiffs, a causative factor of 1.99 and significant evidence eliminating other known causes, defendants' proposition would still exclude the epidemiological proof. Even though the physical problems of just under one-half of the plaintiffs (without reference to the additional causative proof) would have *456 been statistically "caused" by the factor being studied, none could recover. Yet, if a new study raised the risk factor to 2.01, all of the plaintiffs could use the study to collect damages, although for nearly one-half of the group, the risk factor was not an actual cause of the condition. This makes little sense, scientifically or legally.
We can understand some high threshold risk-factor limitation on the admission of the epidemiological study itself, if the study is offered, not as a foundation for a physician's explanatory opinion, but as direct evidence of causation. But even if a study is deemed separately admissible, it is merely evidential, and requires explanation. In the case before us, however, unlike in Landrigan, testimony concerning the studies was offered not as substantive evidence, but only as one of the bases for Dr. Daum's opinion, see Evid.R. 56(2), thus opening her to the cross-examination, presentation of contrary proofs, and ultimately the resolution of the issue by a jury as envisioned in Ryan. 121 N.J. at 288, 579 A.2d 1241. Cf. Evid.R. 57. Evid.R. 56(2) specifies that "the facts or data [upon which the expert bases an opinion] need not be admissible in evidence"[7] if they are of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."
Dr. Daum's opinion, substantiated by her clinical findings and the epidemiological studies that she determined significant, would not have been a "net" opinion, and therefore her testimony at the retrial should not have been precluded. In the case before us we need not, for the reasons stated earlier, set any risk factor limitation at 2.0 or any other arbitrary number. The total basis for the expert's opinion must be scrutinized.
*457 For the retrial, we must give an additional cautionary note. The rulings in these cases appear to be predicated upon a notion that there was but a single cause of the particular cancer condition. There is no requirement in the law that a single cause be found and proven. All that is required is that the plaintiff show that a defendant's conduct or defective product was a proximate cause of the condition, i.e., a substantial factor in bringing the condition about. Brown v. United States Stove Co., 98 N.J. 155, 171, 484 A.2d 1234 (1984); Sholtis v. American Cyanamid Co., 238 N.J. Super. 8, 21, 568 A.2d 1196 (App.Div. 1989). Apparently, the "more likely than not" or 51% standard has in this and its companion cases been thought of as applying to asbestos exposure as the single cause of the disease, rather than to the proof of a significant factor in bringing about the disease. We do not tell a jury that a significant factor must be one that is 5%, 15%, 30% or 40%; we merely tell a jury that it must be "significant."[8]
Putting this principle into context, plaintiff seeks to show that the extensive exposure to asbestos[9] was a significant factor in the causation of the colon cancer. Even though there may have been other causative factors, proof of that proposition is what must be shown to a reasonable degree of medical probability. Assuming a jury finds, for example, a 30% factor is "significant," plaintiff must show that it was more likely than not that this 30% factor was present in his case.
*458 The summary judgment entered in favor of defendants is reversed, and this matter is remanded to the Law Division for further proceedings in accordance with this opinion.
NOTES
[1] The remittitur order was procedurally incorrect. Remittitur is appropriate for the trial court when only the quantum of damages is found excessive. Where a trial court finds that the damages awarded also indicate a tainted liability determination, a new trial is warranted on all issues. Compare Baxter v. Fairmont Food Co., 74 N.J. 588, 597-598, 379 A.2d 225 (1977) with Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 231, 276 A.2d 861 (1971) and Henker v. Preybylowski, 216 N.J. Super. 513, 517, 524 A.2d 455 (App.Div. 1987). Since the trial judge expressly found the entire verdict to be tainted, it was error to offer plaintiffs remittitur. However, as plaintiff rejected the remittitur, this error was harmless.
[2] So that we would have an understanding of what testimony of Dr. Daum was being incorporated by reference by counsel and the court, defense counsel have by way of supplemental appendix supplied us with a transcript of Dr. Daum's testimony in the Komenda action. Plaintiffs have objected to this material as an unwarranted expansion of the trial record, and have moved to strike this supplemental appendix. We reserved this motion until our hearing and now deny it. While, strictly speaking the Komenda expert testimony was not a part of the record, we cannot read the colloquy just quoted as anything less than incorporation by reference of this material. The trial judge determined that if Dr. Daum testified consistent with her testimony in Komenda, such testimony would be insufficient to withstand a summary judgment motion. It is impossible for us to review that ruling without scrutinizing the supplemental materials submitted by defendant.
[3] She stated in her testimony:

Q. Could you tell the jury the history that Mr. Gasko gave you?
A. Yes. He was 52. He told me he had cancer of the colon removed in 1974 and that he was very fortunate in having no recurrence of the tumor and had, after the resection of this tumor, had normal bowel habits. That is the extent.
I took a much longer history. That is the medical history and surgical history....
* * * * * * * *
THE WITNESS: I took many more pieces of information from him. That is part of the history.
Q. Did you take any family history?
A. Right. His mother did have  her death was caused at age 46 of cancer of women's organs. I don't know which ones. And his father, age 77, of a heart attack.
He never smoked. He didn't drink and he had worked with asbestos, which I also took an extensive history of.
Q. Now, were any of those things in the history significant to you in attempting to determine the cause of this cancer?
A. Yes.
* * * * * * * *
Q. Doctor, after examining Mr. Gasko and examining his history, were you able to form an opinion based on reasonable medical probability as to the cause of his cancer of the cecum?
A. Yes.
Q. What is your opinion?
A. It was my opinion and it is still, that his occupational exposure to asbestos was a significant contributing factor to the development of the cancer of the cecum that he had. It may not have been the sole factor, but a significant identifiable contributing factor.
[4] Epidemiology is one of several methods to resolve the difficult problem of causation in hazardous substance litigation. The scientific process has been succinctly explained in II Report to the American Law Institute of the Project on Enterprise Responsibility for Personal Injury (April 15, 1991), p. 324:

Epidemiology is the application of statistical techniques to the study of disease in groups of individuals. Epidemiologists do not conduct experiments because they have no control over the factors that produce effects in their study populations. Rather, the epidemiologist looks for statistical correlations between exposures and disease. In epidemiological `cohort' studies potential `cause' (such as cigarette smoking) has been observed and there is a search for an `effect.' Of course, epidemiology does not make direct observations of causation; rather, the epidemiologist can determine only how frequently a certain exposure would be associated with a particular effect as a matter of chance.
The A.L.I. reports suggests several alternatives to our present judicial processing of such information.
In an epidemiological study risk factors are expressed in numerical terms. A risk factor of 1.0 indicates that the portion of the population with the factor being studied yielded the same results which were to be expected from an analysis of the general population; a factor of 1.5 would indicate 1 1/2 times the expected incidence; a factor of 2.0, twice the expected incidence. See also Landrigan v. Celotex Corp., 243 N.J. Super. 449, 456-458, 579 A.2d 1268 (App.Div. 1990), certif. granted, ___ N.J. ___ (1990); and see Thompson v. Merrell Dow Pharmaceuticals, Inc., 229 N.J. Super. 230, 244, n. 7, 551 A.2d 177 (App.Div. 1988).
[5] For example, if there were ten recognized risk factors for a particular disease and the physician was able to rule out nine of them, the tenth, although having only a small positive correlation, might be said to be a proximate cause of a plaintiff's harm. On the other hand, there might be only two known factors causing a disease, each, however, with a small positive correlation, with all other causes being unknown but obviously comprising the prime factors in the vast majority of cases. Ruling out one of the two known minor causes would not necessarily make the other a significant factor.
[6] The trial judge's function, as noted in Ryan, is to inquire into and determine "whether experts in the given field rely" upon such studies. 121 N.J. at 289, 579 A.2d 1241. After the offering party meets this threshold requirement, the court must presume such reliance reasonable. Ibid. "Allowing the court to overrule that presumption of reliability will result in the exclusion of evidence only under unusual or extreme circumstances...." Ibid. Here, there appeared to be no question that at least some experts rely on studies such as those described by Dr. Daum.
[7] This is not to say that the epidemiological studies could not be independently evidential, but if so offered, a separate foundation for their admission would be required.
[8] See, e.g., Stephenson v. R.A. Jones & Co., Inc., 103 N.J. 194, 199, 510 A.2d 1161 (1986), where in a different setting, the jury found that a 5% causative factor on the part of a manufacturer was significant, thus (because of workers' compensation principles) requiring the manufacturer to bear 100% of the damages.
[9] In this case plaintiff posited, inter alia, that the asbestos fibers were actually ingested when he ate lunch. Usually the theory is that they lodged in the patient's lungs, were coughed up and swallowed, and proof of ingestion is found in remaining fibers in tissue or the plural lining of the lungs. None of such additional medical proof was present here.