NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-4439-11T2
                    A-4705-11T2
                    A-4713-11T2

ESTATE OF JACK D'AVILA,
by TIAGO D'AVILA,
Administrator ad Prosequendum;
and DENISE ROCHA, individually,

     Plaintiffs-Respondents/
     Cross-Appellants,

v.

HUGO NEU SCHNITZER EAST; SIMS
HUGO NEU CORPORATION; HUGO NEU
CORPORATION; LYNCH, GIULIANO &
ASSOCIATES, P.A.; JERSEY CITY
MEDICAL CENTER, PATRICIA A.
SCHRADER, M.D.[1]; AMY R. CUTSHALL,
R.N.; CHRISTINE PANGILINAN, R.N.;
CONCHITA GARCIA, R.N.; and
LIBERTY SURGICAL ASSOCIATES,

     Defendants-Respondents,

and

FEMCO MACHINE COMPANY,

     Defendant-Appellant/
     Cross-Respondent,

and

RIVERSIDE ENGINEERING,

     Defendant,

<div style="border:1px solid black; display:inline-block; padding:8px; text-align:center;">
<strong>APPROVED FOR PUBLICATION</strong>

<strong>August 10, 2015</strong>

<strong>APPELLATE DIVISION</strong>
</div>

---

[1] Because all claims against Dr. Schrader have been satisfied, she did not participate in these appeals.

and

HUGO NEU SCHNITZER EAST; SIMS
HUGO NEU CORPORATION; and HUGO
NEU CORPORATION,

     Defendants/Third-Party
     Plaintiffs-Respondents,

v.

SIMPSON & BROWN, INC.,

     Third-Party Defendant/
     Fourth-Party Plaintiff-
     Respondent/Cross-Appellant,

v.

AMERICAN HOME ASSURANCE COMPANY,

     Fourth-Party Defendant-
     Respondent,

and

WILLIS NORTH AMERICA, INC.
(as successor-in-interest to
Fleet Insurance Services, Inc.),

     Fourth-Party Defendant-
     Respondent.

_____

CONTINENTAL CASUALTY COMPANY,

     Plaintiff-Respondent,

v.

AMERICAN HOME ASSURANCE COMPANY,

     Defendant-Respondent,

and

CRUM & FORSTER SPECIALTY INSURANCE
COMPANY,

     Defendant-Appellant,

and

SIMPSON & BROWN, INC.,

     Intervenor-Defendant/
     Respondent.

_____

CONTINENTAL CASUALTY COMPANY,

     Plaintiff-Respondent,

v.

AMERICAN HOME ASSURANCE COMPANY,

     Defendant-Appellant,

and

CRUM & FORSTER SPECIALTY INSURANCE
COMPANY,

     Defendant-Respondent,

and

SIMPSON & BROWN, INC.,

     Intervenor-Defendant/
     Respondent.

_____

Argued November 17, 2014 - Decided August 10, 2015

Before Judges Sabatino, Simonelli, and Guadagno.

A-4439-11T2

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket Nos. L-3208-07 and L-3380-09.

Joseph P. LaSala and Richard J. Williams, Jr., argued the cause for appellant Femco Machine Company in A-4439-11 (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Mr. LaSala and Michael J. Marone, of counsel; Mr. Williams and Mr. Marone, on the briefs).

Michael B. Zerres argued the cause for respondents/cross-appellants Estate of Jack D'Avila and Denise Rocha, individually, in A-4439-11 (Blume, Donnelly, Fried, Forte, Zerres & Molinari, PC, attorneys; Mr. Zerres, on the briefs).

Scott C. Arnette and Ronald Betancourt argued the cause for respondent/cross-appellant Simpson & Brown in A-4439-11 (Betancourt, Van Hemmen, Greco & Kenyon, LLC and Arnette Law Firm, LLC, attorneys; Mr. Arnette, of counsel; Mr. Betancourt and Virginia A. Harper, on the briefs).

Gerard M. Green argued the cause for respondents Hugo Neu Schnitzer East, Sims Hugo Neu Corporation, and Hugo Neu Corporation in A-4439-12 (Law Offices of Gerard M. Green, attorneys; Mr. Green, on the briefs).

Catherine J. Flynn Tafaro argued the cause for respondents Amy R. Cutshall, R.N. and Jersey City Medical Center in A-4439-11 (Carroll, McNulty & Kull, LLC, attorneys; Ms. Flynn Tafaro, of counsel; Brad Baldwin, on the brief).

Michael R. Ricciardulli argued the cause for respondent Conchita Garcia, R.N. in A-4439-11 (Ruprecht Hart Weeks & Ricciardulli, LLP, attorneys; Mr. Ricciardulli, of counsel and on the brief; Sarah J. Gurka, on the brief).

4

Abraham E. Havkins (Havkins Rosenfeld Ritzert & Varriale, LLP) argued the cause for appellant Crum & Forster Specialty Insurance Company in A-4705-11 and as respondent in A-4713-11.

Nancy Lem argued the cause for respondent Continental Casualty Company in A-4705-11 (Colliau Elenius, attorneys; Ms. Lem, on the brief).

Michael A. Spero argued the cause for appellant American Home Insurance Company in A-4713-11, and as respondent in A-4439-11 and A-4705-11 (Eckert, Seamans, Cherin & Mellott, LLC, attorneys; Mr. Spero, of counsel and on the brief).

Margaret T. Korgul argued the cause for respondent Willis North America, Inc. in A-4713-11 (K&L Gates, LLP, attorneys; Anthony P. La Rocco, of counsel; Ms. Korgul and Matthew S. Sachs, on the brief).

Ryan Milun argued the cause for respondent Simpson & Brown, Inc. in A-4713-11 (The Killian Firm, P.C., attorneys; Mr. Milun, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This mammoth set of consolidated appeals and cross-appeals involves over a dozen parties. The matter concerns both a wrongful death case against multiple defendants tried over four months before a jury, and a host of related insurance coverage issues decided by the trial court.

The litigation stems from a workplace accident on a construction site, in which a subcontractor's employee was struck

5

on the head by an unsecured metal ladder and became paralyzed. Following that traumatic injury, the worker received negligent medical treatment, including the deprivation of sufficient oxygen, causing him brain damage. He died three years later.

The worker's estate filed suit against the job site's owner that served as the project's general contractor, several of the worker's post-accident medical providers, and various other parties. The owner filed separate claims for contractual indemnification against both the worker's own employer and against an installation subcontractor, alleging that each of them bore responsibility for the hazard posed by the unsecured ladder. Additionally, several insurers and an insurance broker whose policies were implicated by the accident sought coverage rulings.

Because the exclusive remedy provision within the worker's compensation statute, N.J.S.A. 34:15-8, does not preclude a negligent employer's liability for contractual indemnification, the trial court allowed counsel for decedent's employer to present evidence and arguments at the jury trial. However, the court did not allow the jury to consider allocating any percentage of fault to the employer on the verdict form, despite the requests of several parties, including the employer itself.

The jurors returned a multi-million-dollar verdict, which they allocated in percentages among the owner, the installation

6

subcontractor, and one of the defendant medical providers. The trial court separately disposed of the related insurance coverage issues without conducting any evidentiary proceedings.

Among the myriad issues presented to us, we have been asked to consider questions relating to whether, and to what extent, an injured worker's employer may participate in a jury trial of an underlying tort action, in a situation where the factual determinations could trigger the employer's duty to indemnify a defendant in the tort case.

We hold that the trial court erred here in allowing the decedent's employer to participate in the jury trial while simultaneously disallowing the jury from ascertaining that employer's percentage of fault, if any, on the verdict form. In light of that error, we remand this matter to the trial court to consider the need for further proceedings relating to such potential allocation of fault to the decedent's employer.

The need for such further proceedings in this case will depend upon whether the job site owner is continuing to press its claims of contractual indemnification against both the decedent's employer and the installation subcontractor. If so, additional fact-finding might be required to sort out the priority or division of the respective payment obligations of the two subcontractors as co-indemnitors. Such supplemental fact-finding shall not,

7

however, disturb the verdict already obtained by plaintiffs. We reject the installation subcontractor's demand for a new jury trial on all issues, particularly since that appellant failed to object at trial to the employer's omission from the verdict form.

We also remand this matter for the trial court's further consideration of certain discrete insurance coverage issues.

In all other respects, we affirm the trial court's rulings and the final judgment predicated on the jury's verdict, thus denying relief on the plethora of other issues raised on appeal in the parties' twenty-three briefs.[2]

## I.

We derive the following pertinent facts from the evidence adduced during the lengthy jury trial. The trial spanned nearly forty intermittent days between October 2011 and January 2012. We describe the facts in considerable detail because those details are legally significant to many of the assorted issues of liability, indemnification, and insurance coverage raised on appeal.

### The Job Site and the Parties' Relationships

The decedent, Jack D'Avila, was a laborer employed by third-party defendant Simpson & Brown, Inc. ("S&B"), a subcontractor on

---

[2] We were informed several days ago that Femco recently reached a settlement with plaintiffs, a development which resolves some of the issues raised on appeal.

a job site in Jersey City. The project involved the installation of a 700-foot "mega shredder" at the facility of defendant, Hugo Neu Corporation.[3]

Hugo Neu is a metal recycling company. At the Jersey City location, Hugo Neu processed scrap metal and loaded it onto ships. The mega shredder being installed on the site required a concrete foundation, referred to in the record as the "mill base" or "shredder base." The shredder's motor required a separate concrete foundation, referred to in the record as the "motor base."

Although Hugo Neu disputed at trial its actual role concerning the project, the proofs reflect that the company served as its own general contractor. Hugo Neu obtained the necessary permits, contracted with a variety of companies to perform the necessary work, created a master schedule, and exercised "general supervisory authority" over the project.

Hugo Neu contracted with decedent's employer, S&B, to serve as a subcontractor for concrete foundations and structural work. Hugo Neu separately arranged for another subcontractor, defendant Femco Machine Company ("Femco"), to assemble and install the shredder. Hugo Neu had worked with both S&B and Femco in the

---

[3] The pleadings also identify affiliated companies of this defendant, specifically Hugo Neu Schnitzer East and Sims Hugo Neu Corporation. We shall refer to these entities collectively as "Hugo Neu."

9

past. Another subcontractor, defendant Lynch, Giulano & Associates, P.A. ("LGA"), was hired to perform surveying work on site.

> **[At the direction of the court, the published version of this opinion omits this portion of Part I, which describes the ladder safety requirements and practices among the construction defendants.]**

The Decedent's Accident

The accident occurred on May 18, 2005. The trial testimony centered around determining who had placed ladders against the motor base in the days leading up to the accident, a time frame when Femco was preparing for installation of the shredder.

> **[At the direction of the court, the published version of this opinion omits Section 1 of Part I, which describes the testimony regarding the placement of the ladder in the days leading up to and on the day of the accident.]**

2. The Ladder's Impact with Decedent

At approximately 3:45 p.m. on May 18, a ladder that had been leaning against the motor base fell and hit decedent on the head. Many of the witnesses agreed that the ladder most likely belonged to S&B, because Femco did not have ladders that long, and Hugo Neu did not provide ladders to the contractors.

Femco's employee John Padchin observed the accident while climbing the ladder placed against the mill base. He testified that he heard a "scraping" noise and observed the ladder on the

10

motor base move as a strong "gust of wind" came through. Some witnesses recalled that the weather had been nice that day, and not particularly windy. However, others recalled it being a windy day, and most agreed that the site tended to be windy due to its location along the Hudson River.

S&B prepared an incident report, simply noting that the accident had occurred and the nature of the accident. Nearly one year later, an investigator for S&B prepared a somewhat more detailed report indicating that decedent had been working in "a shallow trench performing foundation work" at the time of the accident. There was a "taller foundation next to the trench." Leaning up against the foundation was a twenty-foot extension ladder, which was not being used.

According to the report, the ladder belonged to S&B and had been used by S&B personnel the previous day. The investigator noted that "[t]he ladder was tied off at the bottom, but was not tied off at the top, since the workers the previous day had finished with the ladder and untied it before they came down." The report reflects that S&B's project superintendent told the investigator it was "not a particularly windy day, but for some reason the ladder slipped from its position and came down on [decedent]," and "[t]he ladder was still tied at the bottom when it fell."

11

**[At the direction of the court, the published version of this opinion omits this portion of Part I, which describes the liability experts' competing opinions at trial.]**

Decedent's Injuries and Medical Treatment

After he was struck by the ladder, decedent fell down, and various workers on the construction site told him to remain where he was until medical help arrived. He was conscious and communicating, and apologized for getting hurt. The remaining workers returned to their work.

Decedent was transported to defendant Jersey City Medical Center ("JCMC") for medical treatment. In the emergency room, he was able to speak and to move his hands, feet, arms, and legs, albeit with difficulty, and with some loss of feeling.

Decedent had suffered spinal fractures at disc levels C2 and C7. At level C3-C4, he had suffered bruising and swelling of the spinal cord and a bulging disc. These injuries were causing neurological damage, including partial paralysis, with the right side more affected than the left. By the time decedent was seen by a neurosurgeon, he could not move his right hand or leg.

The neurosurgeon performed a discectomy, removing the bulging disk at C3-C4 to prevent possible worsening of the cord compression. He also put in a plate at C3-C4, to stabilize decedent's spine at that level. The medical records show no reported complications with the surgery.

12

Post-surgery, decedent was sent to the surgical Intensive Care Unit, where he was under the supervision of defendant Patricia A. Schrader, M.D., a trauma surgeon who also was director of the unit. Defendant Christine Pangilinan, R.N., was decedent's nurse from 7:00 a.m. to 7:00 p.m. on May 19. Defendant Conchita Garcia, R.N., was his nurse from 7:00 p.m. on May 19 to 7:00 a.m. on May 20. Defendant Amy R. Cutshall, R.N., was his nurse from 7:00 a.m. to 7:00 p.m. on May 20.

At the start of Nurse Pangilinan's shift, the doctor's orders were for decedent to receive nothing by mouth ("NPO"). However, decedent was later allowed ice chips only. At 10:15 a.m. on May 19, Dr. Schrader evaluated decedent and ordered that he could have clear liquids and one can of a nutritional supplement three times per day. Dr. Schrader also ordered that decedent be advanced to regular food "as tolerated."

As to the paralysis, Dr. Schrader's notes from the May 19 evaluation reflect that decedent was able to flex both elbows, as well as his left foot and left hip. However, decedent was not able to flex his right foot or right hip.

On the morning of May 20, Dr. Schrader visited with decedent and spoke with Nurse Cutshall about his condition. Dr. Schrader noted that decedent's spinal cord injury appeared to be progressing to quadriplegia, albeit incomplete. She also noted that decedent

13

had lost the ability to move his fingers in order to utilize the patient-controlled analgesia device (the "PCA").

Dr. Schrader had concerns about decedent possibly experiencing respiratory difficulty, so she ordered a baseline measure of his arterial blood gas, and that he be observed for "increased accessory muscle use" when breathing, which would be an early sign of respiratory distress. She did not consider intubating decedent at that time, however, because he was breathing on his own and had a good cough.

Dr. Schrader stated that she would not intubate a patient unless it was necessary for the patient to breathe, or to protect an unconscious person's airway. She explained that there were risks to intubation, including possibly worsening the spinal cord injury with the movements necessary to achieve intubation, as well as infection or pneumonia.

Nevertheless, to minimize the risk of aspiration, Dr. Schrader declared decedent NPO based upon swallowing difficulties reported and demonstrated by Nurse Cutshall. Dr. Schrader also ordered a swallowing evaluation, and that a feeding tube be made available for possible placement into the patient.

At 9:55 a.m., about forty minutes after Dr. Schrader had completed rounds with decedent, he experienced respiratory distress. Nurse Cutshall heard him coughing, so she went to check

14

A-4439-11T2

on him.  Concerned that he may be choking, the nurse suctioned his airway, but it did not help.  She also called for the doctor, and Dr. Schrader returned to decedent's room.

At approximately 10:00 a.m., decedent's oxygen saturation was down to 31 percent, whereas most people are at 97 to 100 percent, and he had a heart rate of 45 beats per minute, indicating sinus bradycardia.  Dr. Schrader ordered that a call be placed for anesthesia service to intubate decedent, and also prepared to intubate him herself if necessary.

At 10:05 a.m., a nurse anesthetist was able to intubate decedent on an emergent basis.  A note written by Dr. Schrader indicated that "blood tinged, beige material" was suctioned from decedent's airway at the time of intubation.  Dr. Schrader testified at her deposition that there were different possible sources of the beige material, including mucous from the lung.

On manual ventilation, decedent's oxygen saturation was brought up to 100 percent, and his heart rate brought up to 118 beats per minute.  However, he had suffered five-to-seven minutes of oxygen desaturation, resulting in "anoxic brain injury."

Decedent's Remaining Life and Demise

Decedent spent the rest of his life in various healthcare facilities, and he remained on a ventilator except for one week.

15

He died in July 2008, at age fifty-one, after he suffered a downturn and his family decided to discontinue the ventilator.

In their testimony, decedent's wife and children described their losses due to his passing. They presented expert testimony on damages, which was rebutted by experts presented by S&B.

The medical experts disagreed as to whether decedent's respiratory distress occurred due to damage to his phrenic nerves, caused by his spinal cord injury, or due to aspiration. They also disagreed as to whether the nurses should have advised Dr. Schrader sooner about decedent's difficulties with swallowing and operating the PCA, and whether Nurse Cutshall had erred by demonstrating decedent's swallowing difficulties during Dr. Schrader's rounds, thereby adding more fluids and increasing the risk of aspiration. The experts further disagreed as to whether Dr. Schrader had acted appropriately in not intubating decedent until he suffered the respiratory event, or whether she should have electively intubated him earlier, during rounds.

Finally, the medical experts contested whether the initial injury or the period of oxygen desaturation had caused decedent's complete quadriplegia. They specifically differed as to whether the period of oxygen desaturation had caused decedent's permanent brain damage, or whether that damage occurred during a later event,

16

when decedent suffered an extremely high fever of over 105 degrees as a result of damage to his central nervous system.

## II.

The Tort Action

In March 2007, Tiago D'Avila ("Tiago"), then-guardian for his father Jack D'Avila, and Denise Rocha, Jack D'Avila's wife, filed a complaint in the Law Division in the underlying tort litigation. Their complaint was amended multiple times. Ultimately, the tort action named as defendants: Hugo Neu; Femco; Riverside Engineering ("Riverside"); LGA; JCMC; Dr. Schrader; Nurse Cutshall; Nurse Pangilinan; Nurse Garcia; and Liberty Surgical Associates ("Liberty Surgical"), one of Dr. Schrader's employers.

Plaintiffs asserted claims of construction negligence and medical malpractice, wrongful death, and a loss of consortium claim for Rocha. Riverside was later dismissed from the case on summary judgment, a dismissal that no one contests on appeal.

Defendant Hugo Neu filed a cross-claim against defendant Femco arising out of their contractual relationship. Hugo Neu also filed a third-party complaint against S&B for contribution and indemnification, and for breach of contract.

S&B denied liability and asserted that all claims for contribution were barred by the exclusive remedy provision of the Workers' Compensation Act ("the WCA"), N.J.S.A. 34:15-8. S&B also

17

asserted a counterclaim and cross-claims for contribution and indemnification.

S&B filed a fourth-party complaint against its insurer, American Home Assurance Company ("American Home") and Willis North America, Inc., as successor in interest to Fleet Insurance Services, LLC ("Willis"). S&B alleged breach of fiduciary duty and negligence against Willis, its insurance broker, for failing to obtain the coverage S&B had requested. S&B also asserted breach of contract and declaratory judgment claims against American Home, seeking primary and non-contributory insurance coverage for Hugo Neu under its policy.

The Declaratory Judgment Coverage Actions

In a related action, Hugo Neu's insurer, Continental Casualty Company ("Continental"), filed a complaint for declaratory judgment against American Home and Femco's insurer, Crum & Forster ("C&F"), seeking a declaration that those two insurance companies were responsible for providing coverage for defense and indemnity to Hugo Neu in the underlying litigation.

Both American Home and C&F asserted cross-claims against each other and counterclaims against Continental. S&B intervened as a defendant in the coverage action and filed an answer with cross-claims.

18

<u>Pretrial Motions and Proceedings</u>

On February 5, 2010, the trial court ruled on a summary judgment motion filed by Continental. The court issued an oral opinion, ruling that Hugo Neu was an additional insured under both the American Home and C&F policies. In that same ruling, the court consolidated the underlying tort case with the declaratory judgment action. Several days later, the court entered an order granting summary judgment to Continental as to the discrete issue of Hugo Neu's additional insured status, and consolidating the two cases.

After Continental moved again for summary judgment on different grounds, the court[4] issued an oral opinion on June 9, 2010, ruling that both American Home and C&F were responsible for providing primary, non-contributing insurance to Hugo Neu.

On July 23, 2010, the second judge ruled on several other pretrial motions. As it relates to the present appeals, the court: (1) issued orders consistent with the June 9, 2010 rulings granting summary judgment to Continental against American Home and C&F, requiring them to "provide primary and non-contributing insurance coverage (both defense and indemnification) up to the full limits of coverage called for" pursuant to the construction contracts

---

[4] A different judge ("the second judge") heard this particular motion.

19

between Hugo Neu and, respectively, S&B and Femco; and (2) dismissed claims against S&B, except that it required S&B to provide "a complete defense and full indemnification" to Hugo Neu pursuant to their contract, "so long as [Hugo Neu] was not found to be solely responsible for Jack D'Avila's accident[,]" and providing "that this contractual indemnification provision between Hugo [Neu] and [S&B] shall not be triggered until the insurance coverage provided by [S&B] has been exhausted." American Home and C&F moved for reconsideration, which was denied.

In the meantime, Continental moved for the appointment of defense counsel and to compel American Home and C&F to pay Hugo Neu's defense fees and expenses. By order dated January 7, 2011, the court denied that motion without prejudice.

After pretrial conferences, a third successive judge who was assigned to this case ("the trial judge") heard and decided various motions in limine. Among other things, the judge granted plaintiffs' application to bar argument that decedent was comparatively negligent and denied a motion to preclude S&B from participating in the litigation. The judge reserved decision on the question of whether the jury could consider S&B's negligence.

The Trial and The Verdict

Before the trial began, plaintiffs' counsel renewed his objection to the court allowing the jury to consider the negligence

20

of S&B. The court clarified that the parties could refer to S&B's negligence in their opening statements to the jury, as it related to the question of whether the negligence of the "construction defendants" (i.e., Hugo Neu, Femco, and LGA) was a proximate cause of decedent's injuries, but the jury would not be asked to assess the comparative negligence of S&B on the verdict sheet. Maintaining its prior ruling, the court denied a motion by Dr. Schrader and JCMC to disallow S&B's participation at trial.

At the close of evidence, the parties made a variety of motions, including motions for directed verdict, which the court denied. The court also again considered whether S&B should be placed on the verdict sheet, and determined that it should not. S&B renewed its motion for a directed verdict, which the court denied.

The jury found that Hugo Neu and Femco were each negligent, and that their negligence was a proximate cause of decedent's injury. The jury found no negligence on the part of LGA. With respect to the job site accident, the jury allocated 75% liability to Femco and 25% liability to Hugo Neu.

As for the medical defendants, the jury concluded that Dr. Schrader, Nurse Cutshall, and Nurse Garcia were negligent. However, the jury also found that only Dr. Schrader's negligence had <u>both</u> increased the risk of harm posed by decedent's pre-

21

existing condition, and had been a substantial factor in causing his ultimate injury. The jury concluded that Nurse Cutshall's and Nurse Garcia's negligence had increased the risk of harm, but had not been a substantial factor in causing decedent's ultimate injury. The jury found no negligence on the part of Nurse Pangilinan.

Finally, the jury specifically found that 77% of decedent's ultimate injury would have occurred even if the medical treatment had been proper. Thus, it assessed Dr. Schrader as the cause of 23% of decedent's injury.

The net effect of these determinations, as molded by the court, was to hold Femco 57.75% liable for the judgment, Hugo Neu 19.25% liable, and Dr. Schrader 23% liable.

As to damages, the jury awarded $2,249,668 in medical expenses, $152,196 in lost income, and $3,800,000 in pain, suffering, disability, impairment, and loss of enjoyment of life. Decedent's wife (Rocha) was awarded: $50,000 for the loss of consortium; $54,397 in past losses; and $334,150 in future losses. Decedent's children (daughter Tienne and son Tiago) were each awarded: $49,417 in past losses and $303,559 in future losses.

Finally, the jury concluded that Hugo Neu and Femco had not proven that Dr. Schrader's negligence was an intervening, superseding cause of decedent's ultimate harm.

22

Post-Trial Motions

After several parties filed post-trial motions, the trial judge issued a written letter opinion dated April 12, 2012. In that decision, the judge reaffirmed the pretrial rulings that obligated American Home and C&F to provide Hugo Neu with primary, non-contributing insurance, and required those insurers to pay the judgment against Hugo Neu. The judge also denied Femco's motions to dismiss Hugo Neu's claim against it for contractual indemnification, and further denied Femco's motion for judgment notwithstanding the verdict or, alternatively, a new trial.

The judge further denied Dr. Schrader's motion to mold the verdict so that only the so-called "construction defendants" the jury had found to be at fault (i.e., Hugo Neu and Femco) were liable. In addition, the judge required Femco to indemnify Hugo Neu pursuant to their contract; and suspended prejudgment interest on two-thirds of the award for medical expenses.

The Final Judgment, As Amended

The court entered an initial final judgment, in accordance with the verdict and its post-trial rulings, and entered orders on the post-trial motions, consistent with its written opinion. Pursuant to the judgment, the total award, with prejudgment interest, amounted to $8,534,726.27.

A-4439-11T2

Meanwhile, the court granted Continental's motion for payment of interim defense fees and expenses, which was opposed by C&F and American Home.

On June 11, 2012, the court entered an amended judgment, adding modest taxed costs of $1,230, increasing the aggregate judgment to $8,535,956.27, with $4,929,514.75 allocated to Femco, $1,643,171.58 allocated to Hugo Neu, and $1,963,269.94 allocated jointly to Dr. Schrader, Liberty Surgical, and JCMC.

The trial court thereafter entered a second amended judgment, requiring American Home and C&F to provide primary and non-contributory coverage for the judgment against Hugo Neu, and requiring C&F to provide primary and non-contributory coverage for the judgment against Femco.

### The Myriad Appeals

The trial court stayed the judgment, conditioned upon the posting of a supersedeas bond. Appeals were subsequently filed by, respectively: plaintiffs, Femco, S&B, C&F, and American Home. Plaintiffs subsequently settled with Dr. Schrader and her employers, Liberty Surgical and JCMC.

### III.

Femco, which bears the largest share of liability under the jury's verdict, raises on appeal several interrelated issues of negligence and contractual indemnification.

24

Specifically, Femco argues that the trial court erred by: (1) allowing decedent's employer, S&B, to participate in the trial while disallowing the jury to consider S&B's alleged negligence; (2) ruling that Femco was obligated to indemnify Hugo Neu for Hugo Neu's own negligence. Femco further argues that the jury's apportionment of fault against it was against the weight of the evidence. The remaining issues raised on appeal by Femco were resolved through its recent settlement with plaintiffs.

Meanwhile, the issues raised by S&B in its cross-appeal include an argument that the trial court erred by denying S&B's motion for partial summary judgment, and holding that S&B is liable to Hugo Neu for contractual indemnification.

The first of these issues — concerning the appropriate role of decedent's employer in the jury trial — raises important questions of law and procedure about the employer's inclusion or omission from the verdict form. We devote the following analysis in this published portion of our opinion to that thorny issue.

Because these issues concerning the employer's role at trial are closely intertwined with the issues of negligence liability and contractual indemnification that also have been raised, we include them within our analysis in this section of the opinion as well.

25

A.

The WCA, N.J.S.A. 34:15-1 to -142, "represents the bargain that was struck between employers and employees concerning workplace injuries, whereby employers shoulder the expense of workers' injuries arising out of the performance of work duties." Basil v. Wolf, 193 N.J. 38, 53 (2007). The WCA "provide[s] a method of compensation for the injury or death of an employee, irrespective of the fault of the employer or contributory negligence and assumption of risk of the employee." Harris v. Branin Transp., Inc., 312 N.J. Super. 38, 46 (App. Div.), certif. denied, 156 N.J. 408 (1998).

As part of the bargain struck by the Legislature in the WCA, N.J.S.A. 34:15-8 directs that an employer may not be sued by an employee or an employee's surviving relatives for negligence that caused injury or death to the employee. Instead, workers' compensation is the exclusive remedy, absent proof of an intentional wrong. Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 183 (1986); McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 489-90 (App. Div. 2011). Thus, plaintiffs in this case could not proceed with a claim against S&B, decedent's employer.

Case law establishes that the WCA does not, however, preclude an injured employee from pursuing claims against third-party

26

tortfeasors.  Instead, "an employee retains the right to pursue available common-law remedies for liability against third-parties, so long as recoveries are not duplicated."  McDaniel, supra, 419 N.J. Super. at 491 (citing Schweizer v. Elox Div. of Colt Indus., 70 N.J. 280, 287-88 (1976)).  Thus, plaintiffs could and did pursue claims against alleged other tortfeasors, including Femco and Hugo Neu.

Consistent with the WCA's exclusive remedy proviso, defendants could not seek contribution from S&B under the Joint Tortfeasors Contribution Law ("the JTCL"), N.J.S.A. 2A:53A-1 to -5.  "Because the employer cannot be a joint tortfeasor, it is not subject to the provisions of the [JTCL], and a third-party tortfeasor may not obtain contribution from an employer, no matter what may be the comparative negligence of the third party and the employer."  Ramos, supra, 103 N.J. at 184; accord Stephenson v. R.A. Jones & Co., 103 N.J. 194, 199 (1986); McDaniel, supra, 419 N.J. Super. at 492-93.

Hence, in the context of a plaintiff-employee's negligence claims against other tortfeasors relating to workplace injuries, the jury cannot be asked to apportion fault to the plaintiff's own employer, even if that seems like "a more equitable manner of presenting th[e] matter to the jury[.]"  Jarrett v. Duncan Thecker

27

Assocs., 175 N.J. Super. 109, 115 (Law Div. 1980); accord Stephenson, supra, 103 N.J. at 199.

On the other hand, "indemnification of a third party by an employer pursuant to an express contract does not disturb the delicate balance struck by the Legislature in the WCA. Nothing in the WCA precludes an employer from assuming a contractual duty to indemnify a third party through an express agreement." Ramos, supra, 103 N.J. at 191. Accord Mautz v. J.P. Patti Co., 298 N.J. Super. 13, 19-21 (App. Div.), certif. denied, 151 N.J. 472 (1997); Port Auth. of N.Y. & N.J. v. Honeywell Protective Serv., Honeywell, Inc., 222 N.J. Super. 11, 19-20 (App. Div. 1987).

Thus, it was permissible here for Hugo Neu to seek indemnification from S&B, pursuant to their contract, for any of plaintiffs' damages caused by S&B or Hugo Neu. The only legal bar to such a claim would be if Hugo Neu were found 100% liable, because the Legislature has disallowed indemnification agreements imposing liability where the damages in question were caused by the indemnitee's "sole negligence." See N.J.S.A. 2A:40A-1.[5]

---

[5] N.J.S.A. 2A:40A-1 states:

> A covenant, promise, agreement or understanding in, or in connection with or collateral to a contract, agreement or purchase order, relative to the construction, alteration, repair, maintenance, servicing, or security of a building, structure, highway,

28

1.

Published cases in New Jersey have provided mixed signals about how the court should treat an employer named as a third-party defendant, for contractual indemnification purposes, in a tort action brought by an injured employee who has demanded a trial by jury. In particular, the published cases have not been uniform concerning whether the employer should be permitted to participate in the jury trial and, if so, whether and how the employer's alleged negligence should be addressed in the jury charge and in the verdict form.

In White v. Newark Morning Star Ledger, 245 N.J. Super. 606 (Law Div. 1990), the plaintiff, an employee of Colin Service Systems, Inc. ("Colin"), was injured while working on the premises of defendant Newark Morning Star Ledger ("Ledger"). Id. at 608.

railroad, appurtenance and appliance, including moving, demolition, excavating, grading, clearing, site preparation or development of real property connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents, or employees, is against public policy and is void and unenforceable; provided that this section shall not affect the validity of any insurance contract, workmen's compensation or agreement issued by an authorized insurer.

[(Emphasis added).]

29

Colin agreed in its contract with Ledger to indemnify Ledger for any injury or death "in any way relating to the performance by Colin . . . [of the contract] . . . except for such injury . . . due to the affirmative negligent acts of Ledger[.]" Id. at 610. The plaintiff sued only Ledger, alleging negligence, and Ledger filed a third-party complaint against Colin for a defense and indemnification. Id. at 609. Colin moved for summary judgment to dismiss Ledger's third-party complaint, and the Law Division judge denied that motion. Id. at 609, 613.

The Law Division judge in White recognized that if both Ledger and Colin were found to be negligent and to have proximately caused the accident, then "Ledger as the third-party tortfeasor [would] be solely responsible" for the plaintiff's injuries. Id. at 611. Hence, the case required an allocation of fault as between Ledger, the defendant/indemnitee, and Colin, the third-party defendant/indemnitor. Ibid. The judge further noted that there was a genuine issue, at least on the facts presented in the summary judgment record, as to "whether the cause of [the] plaintiff's injury was solely caused by Ledger's negligence." Id. at 613.

The judge in White further concluded that, in deciding "how best to allocate the liability as between Ledger, to the extent that liability results from Ledger's affirmative negligent acts, and Colin[,]"

30

[t]he logical and most efficient means of achieving that result will be by proceeding as this case is presently structured, with both Ledger and Colin as parties. That will enable the same jury to fix the damages due from Ledger to [the plaintiff], while also fixing the amount due to Ledger pursuant to the indemnification provisions of the [contract].

[Id. at 611.]

The judge added that "[a]ny claimed confusion between [the plaintiff's] right to recover from Ledger and Ledger's right to recover from Colin can be avoided by instructions and interrogatories to the jury." Id. at 613. The judge stopped there, however. He did not indicate exactly how the jury should be instructed, or how the special interrogatories on the verdict form should be framed.

Our own court grappled with similar issues four years later in Kane v. Hartz Mountain Industries, Inc., 278 N.J. Super. 129, 134 (App. Div. 1994), aff'd o.b., 143 N.J. 141 (1996). The plaintiff in Kane was a construction worker who was injured on the job, and he sued Hartz Mountain Industries, Inc. ("Hartz"), the general contractor, and others, alleging negligence. Ibid. The plaintiff's employer, Eastern Steel Erectors ("Eastern"), had agreed to indemnify the steel fabricator with whom it had contracted, Howell Steel, Inc. ("Howell"), "and the 'owner' of the project from any losses or claims arising out of Eastern's work

31

on the project." Id. at 135. Therefore, Howell joined Eastern

as a third-party defendant, seeking indemnification pursuant to

their contract. Ibid.

The trial judge in Kane allowed Eastern

> to "participate" in the jury trial of
> plaintiff's case [but not present closing
> arguments], but he ruled that Eastern's
> negligence would be submitted to the jury only
> if the jury first returned a verdict finding
> that neither the Hartz defendants nor [another
> defendant] were negligent, and that Howell was
> 100% negligent. In that event, the court
> would require the jury to decide whether any
> negligence was attributable to Eastern, in
> order to determine the enforceability of the
> Eastern-Howell indemnification agreement.
>
> [Id. at 146.]

Having been so instructed, the jury returned a no-cause verdict.

Id. at 136.

On the plaintiff's appeal in Kane, we concluded there had

been error in the jury charge on the effect of Occupational Health

and Safety Administration ("OSHA") regulations that warranted

reversal. Id. at 140-44. We also found reversible error in the

trial court's treatment of Eastern. Id. at 144-47.[6] We observed

that "it was neither necessary nor appropriate to permit Eastern

to participate in the presentation of [the] plaintiff's case."

---

[6] We rejected the plaintiff's separate contentions of error on an
evidentiary issue and regarding comparative negligence, see id.
at 147-51, which are not pertinent here.

Id. at 146. Given that the nature of the allegations in the case involved "industry-wide or regulatory safety standards," we concluded that Eastern "would not be prejudiced by a separate trial on the indemnification issue." Ibid.

Hence, we ordered in Kane that, on remand, "trial of the third-party claim should be severed, as unquestionably any liability of Howell is not so independent of the failure of Eastern to abide by safety standards as to bring about the result that Howell might be held liable without a similar finding of fault on the part of Eastern." Ibid. We also observed that "[i]n any event, Eastern, merely by reason of its status as indemnitor of Howell, should not be accorded the advantage of participating at trial. A bare agreement to indemnify does not carry with it the obligation to defend, and it does not provide a right to control the litigation." Id. at 146-47 (emphasis added). In making this observation, we did not expressly repudiate White, a case which we noted earlier in the opinion had been relied upon by the trial court. Id. at 136.

Several defendants in Kane, including Hartz, Howell, and Eastern, petitioned for and were granted certification by the Supreme Court. The Court affirmed our disposition in Kane, "substantially for the reasons expressed" in the published opinion. Kane, supra, 143 N.J. at 142. In doing so, the Court

33

provided no additional commentary and did not shed any further light on the employer-participation question. Ibid.[7]

A year after Kane, we confronted similar issues of indemnification in Bradford v. Kupper Associates, 283 N.J. Super. 556 (App. Div. 1995), certif. denied, 144 N.J. 586 (1996). In that case, the plaintiffs were employed by Agate Construction Company ("Agate"). Id. at 563. One plaintiff was killed, and another injured on the job when both inhaled poisonous gas in the Tuckerton sewer system. Ibid. They sued the Tuckerton Borough Municipal Utilities Authority ("TMUA"), and Kupper Associates ("Kupper"), the project engineer, with Agate named a third-party defendant based upon its contractual duty of indemnification. Ibid. The jury returned a no-cause verdict, which we affirmed on appeal. Id. at 563-64. However, we reversed the court's pretrial ruling that Agate was not required to indemnify Kupper and the TMUA. Id. at 564, 582-86.

Construing the indemnification provision within the construction contract in Bradford, we held that the contract "clearly did not require Agate to indemnify only for its own negligence," but rather imposed a broader obligation. Id. at 584. On the other hand, we recognized that the agreement did not require

_____

[7] The Court's very recent discussion of other aspects of Kane in Fernandes v. DAR Development Corp., __ N.J. __ (2015), did not address the employer-participation issue.

34

Agate to indemnify either TMUA or Kupper "solely based upon their exclusive negligence." Ibid. We also were persuaded that the plaintiffs' claims in Bradford "arose or resulted from" the work, as was required under the contract to trigger such a duty to indemnify. Id. at 585.

Turning to the troublesome question of the appropriate role of the plaintiffs' employer, Agate, in the fact-finding process, we suggested in Bradford that Agate might be permitted to participate in the trial. We ultimately did not reach that question conclusively, however, because of the distinctive procedural posture in which the case had been litigated and the appeal had arisen. Instead, we enforced Agate's contractual duty to indemnify TMUA, without requiring any further factual findings on remand by a jury or otherwise:

> The matter may be best resolved, as TMUA and Kupper sought here, by keeping the indemnitor in the case on the indemnification claim. But we need not now decide what the judge should have done had he denied Agate's motion. Rather, we have to determine what we must do in light of the fact that he granted the motion, and we must do so in view of the established record. Of particular importance are the [jury's] determinations that neither TMUA nor Kupper were found liable, although Kupper was found to be negligent.
>
> Here, Agate chose not to participate by moving for a dismissal of the third-party claims. Rather, it sought to be relieved of an obligation to become involved in the trial proceedings.

35

> In these circumstances, taking account of the proofs that Agate violated OSHA regulations, and given a jury verdict finding neither defendant liable for plaintiffs' work-related injuries, <u>we are unprepared to permit Agate to re-litigate the issue of negligence or whether either TMUA or Kupper can be said to be solely negligent</u>.
>
> [<u>Id.</u> at 586 (emphasis added).]

Thus, under the particular circumstances presented in <u>Bradford</u>, we only remanded the case for "consideration of all the issues regarding attorneys' fees and costs for which TMUA and Kupper are entitled under the indemnification clause." <u>Id.</u> at 587. The panel's comment in <u>Bradford</u> about how the participation question "may be best resolved," <u>id.</u> at 586, although it is merely dicta, arguably suggests a willingness to reconsider <u>Kane</u>'s declared prohibition on an employer/indemnitor's participation in the negligence trial. We are mindful, however, that the panel's comment in 1995 about that subject preceded the Supreme Court's 1996 unelaborated affirmance of <u>Kane</u>. We also are mindful that our opinion in <u>Bradford</u> did not discuss <u>Kane</u> or, for that matter, <u>White</u>, regarding the participation issue.

In a later tort case that we reviewed on appeal, <u>Leitao v. Damon G. Douglas, Company</u>, 301 <u>N.J. Super.</u> 187 (App. Div.), <u>certif. denied</u>, 151 <u>N.J.</u> 466 (1997), we noted there that the Law Division had severed at trial a defendant general contractor's third-party

36

complaint for contractual indemnification against the plaintiff's employer. Id. at 190. After the jury found the contractor 51% negligent and the employee 49% negligent, the trial court addressed the indemnification questions. The court ruled that the plaintiff's employer was obligated to fully indemnify the defendant, despite the plaintiff's comparative fault. Id. at 190-91. The court did so because the accident "arose out of" the employer's subcontract and was not caused by the defendant indemnitee's "sole negligence." Id. at 190, 195. Our appellate opinion in Leitao did not consider, however, whether the employer should have been permitted to participate in the jury trial, or whether, in retrospect, the severance of the indemnification issues was proper. Our opinion did not cite to Kane or White and only cited Bradford with regard to a different issue. Id. at 192.

This line of published cases arguably leaves some residual uncertainty about the proper way to proceed in these jury trial situations where a tort defendant has a fact-dependent claim for contractual indemnification against the plaintiff's employer, and about the breadth of the approach we adopted in Kane. We are now asked to consider in the present case — one of truly massive scope — whether the impetus for a unitary proceeding here is stronger than it was in Kane.

37

The dimensions of <u>Kane</u> are distinguishable from the present case, which is not just limited to construction accident defendants and negligence claims but also includes medical malpractice defendants and claims. Here, unlike in <u>Kane</u>, there was no significant risk that the employer, S&B, would "control the litigation." <u>Kane</u>, <u>supra</u>, 278 <u>N.J. Super.</u> at 147. In essence, S&B was, metaphorically, another fish in a very large pond.

The sheer number of defendants and claims in this case compels us to consider whether the approach adopted in <u>Kane</u> should be inflexibly followed in large-scale cases, or whether, conversely, the interests of judicial efficiency should take precedence and warrant an exception to <u>Kane</u>.

2.

A few other state courts and treatise writers have grappled with this perplexing issue. Our research has identified several instances in which the plaintiff's employer took part in the jury trial of the tort case, despite the workers' compensation laws of the applicable state, in order to adjudicate third-party claims brought by a tort defendant against that employer for indemnification.[8]

---

[8] <u>See, e.g.</u>, <u>Giguere v. Detroit Edison Co.</u>, 319 <u>N.W.</u>2d 334 (Mich. Ct. App. 1982) (allowing such indemnification claims to be tried before the jury along with the plaintiff employee's negligence claims against the defendant indemnitee, affirming the trial

On the other hand, some jurisdictions have ruled that, under an express contract of indemnity running from a plaintiff's employer to a third party, "the third party cannot insist that the employer and the employer's insurer be joined in the plaintiff's action for purposes of enforcement of the right of indemnity." 11 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 121.04[5] (Matthew Bender, Rev. Ed. 2014) (emphasis added) (citing Gibbs v. Carolina Power & Light Co., 144 S.E.2d 393 (N.C. 1965) and Baldwin Co. v. Ceco Corp., 659 S.W.2d 941 (Ark. 1983)).

The Larson treatise recommends that "[s]ince the indemnity claim is by definition a separate legal cause, and, unlike the employer's contributory negligence, is not intertwined with the tortious incident itself, every precaution should be taken to see

---

court's denial of the employer's severance motion seeking a separate trial on the indemnification issues); Frederickson v. Alton M. Johnson Co., 402 N.W.2d 794 (Minn. 1987) (permitting the negligence and the indemnification issues to be tried together, but granting a directed verdict to the employer before submitting the case to the jury); Severino v. Schuyler Meadows Club, 639 N.Y.S.2d 869 (N.Y. App. Div. 1996) (affirming a judgment following a combined jury trial on negligence and indemnification issues, in which the jury found the defendant/indemnitee general contractor 20% at fault for the accident and the plaintiff's employer 80% at fault); Berardi v. Getty Ref. & Mktg. Co., 435 N.Y.S.2d 212 (N.Y. Sup. Ct. 1980) (similarly involving a combined jury trial). By contrast, in Levine v. Shell Oil Company, 321 N.Y.S.2d 81 (N.Y. 1971), the parties stipulated that the plaintiffs' negligence claims against the defendant would be tried before a jury, and that the defendant's claims for indemnification against the plaintiffs' employer were to be separately resolved by the trial judge alone. Id. at 84.

39

that the employee's own . . . rights are not prejudiced by the interjection of this [indemnity] factor into his or her case." Ibid. "This kind of tangle is at least partly avoided by [an approach] which sees to it that the first step in the process, the action by the employee plaintiff, goes forward without the complicating presence of the parties and issues involved in the indemnity problem." Id. at § 121.04[7] (emphasis added).

That said, the Larson treatise further recognizes that the problem cannot always be "easily sidestepped," and that there can be circumstances in which the negligence and indemnity issues might need to be tried together. Ibid. As an illustration, the treatise referred to situations in which an insurer for the employer/indemnitor would not provide coverage for that obligation unless the employer's negligence is proven to have caused injury. In that scenario, the employer's carrier "would have an interest in proving that the employer had not in fact negligently contributed to the employee's injuries." Ibid.

3.

The preferred solution to this quandary concerning the employer/indemnitor's proper role at trial, at least in a case with large dimensions like the present one, is by no means obvious. There are competing policies to consider.

40

On the one hand, we recognize the important workers' compensation policies that underlie the exclusive remedy feature of the WCA. We also are mindful of the related desire not to entangle an injured worker's employer indiscriminately in negligence actions that the employee brings against other tortfeasors. Those concerns seemingly weigh in favor of holding separate trials or hearings on indemnification issues.

On the other hand, our system of justice also favors consistency of outcomes, efficiency, and the avoidance of the needless consumption of time and resources to litigation. See, e.g., Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 522 (2006); State v. Gonzalez, 75 N.J. 181, 190, 193 (1977). Those offsetting considerations weigh in favor of attempting to resolve indemnity issues, where possible, within the same trial or before the same fact-finder.

We suspect that, in many instances, such as the present case, a general contractor or project owner routinely will insist on its subcontractors entering into broad indemnification agreements that strive to insulate the owner or general contractor from liability when one of the subcontractors' employees is injured on the job site. Depending on the contractual language utilized, the proper application of those indemnity agreements may require factual findings as to: whether the employee's injury "arose out of" the

41

work encompassed by the indemnity contract; whether the worker's employer was at least in part at fault for the accident; and whether the defendant indemnitee was not itself 100% at fault. These factual issues can be very closely intertwined with the liability proofs and the findings that a jury must make in the underlying negligence case.

Where the parties in the negligence case have not agreed to a bench trial, the jury's paramount function as fact-finder generally ought to include those factual issues relative to contractual indemnification. It could be exceedingly difficult for a trial judge (who would not, of course, be privy to the jury's deliberations) to attempt to adjudicate the proofs in an indemnity proceeding in a manner that would respect the jury's findings but still resolve the open factual questions.

For instance, what if the judge, upon hearing the evidence in a "round two" indemnification trial or proceeding, perceives from the testimony that the co-defendant seeking indemnity was not negligent or only slightly negligent, despite the jury's earlier finding imposing the greatest share of liability upon that defendant? Or, what if the judge perceives that the defendant seeking indemnification from the plaintiff's employer bears a much higher percentage of fault in causing the accident than the level

42

ascribed by the jurors?  This predicament, and the risk of inconsistent outcomes, is surely troublesome.

Moreover, a separate trial or proceeding on indemnification will invariably consume lawyer time and expense, expert time and expense, witness time, and other resources already expended in the earlier negligence trial.  Why should a plaintiff, having already tried the tort case to verdict, need to become entangled in another proceeding, one that only involves the business-driven contractual agreements between his or her employer and another private party?

We have considered the possibility that the factual proofs might be presented simultaneously before the jurors for purposes of the negligence claims and defenses, and for the judge, for purposes of the indemnity issues.  Such a "split fact-finder" approach still can pose several disadvantages, however.  For one thing, the indemnitor or the indemnitee might have demanded a jury on the contractual issues.  Even if no such jury demand were made, the employer/indemnitor has an advocacy interest in presenting evidence, cross-examining opposing witnesses, interposing evidentiary objections, and making arguments during the course of the trial.  It might be difficult to explain to jurors what role counsel for the employer is actually performing at such a trial before "dual" decision-makers.

43

In addition, the judge serving as the fact-finder on the indemnity issues may have questions or need clarification about testimony as the case unfolds. This will place the judge in the difficult position of either letting those queries go unanswered, or interfering ⸺ perhaps too often ⸺ with counsel's presentation of the case to the jurors.

Taking all of these competing concerns into account, we hold that the sounder practice ⸺ in a context such as the present one involving claims even more extensive than those in <u>Kane</u> and an unusually lengthy trial ⸺ is to try the negligence and contractual indemnification issues simultaneously before the jury. After the evidence has been presented at such a trial, the court should issue carefully-crafted jury instructions, addressing the pivotal factual issues that the jury must decide. The verdict form will likewise need to be carefully designed, so as to only have the jurors address the question of the employer's potential fault when it is absolutely necessary to do so.

For example, the jury must be instructed that they should only consider the employer's negligence if they first determine that the conduct of the defendant seeking indemnity is not the sole cause of the accident. Jurors will be presumed to follow such instructions faithfully. <u>See</u> <u>Belmont Condo. Ass'n, Inc. v. Geibel</u>, 432 <u>N.J. Super.</u> 52, 97 (App. Div.), <u>certif. denied</u>, 216

44

<u>N.J.</u> 366 (2013). In this way, the unified trial process will not subvert the policies and objectives underpinning the exclusive remedy provision of the WCA. This unitary fact-finding model avoids discordant results and may conserve the resources of the parties and the court.

The jury should be given appropriate instructions about the presence of the employer's counsel in the trial, explaining that he or she is participating solely with respect to certain factual issues that the jury might need to address. The jury should not be given an "ultimate outcome" instruction divulging that the plaintiff cannot recover any damages from the employer, for we suspect such an instruction would likely engender confusion and speculation.

The judge must mold the verdict after it is issued, so that the plaintiff's damages are not reduced by the employer's percentage share of fault, if any. Instead, the non-employer defendants must fully bear any liability owed to the plaintiff. Thus, for example, if the jury finds defendant "A" 60% at fault, another defendant "B" 20% at fault, and the plaintiff's employer, defendant "C," 20% at fault, with no comparative fault accorded to plaintiff, the employer's 20% share must be divided among the other defendants in a molded judgment that assigns a 75% share to defendant "A" and 25% to defendant "B."

45

We stop short, however, of prescribing that such a combined jury trial on negligence/contractual indemnification issues also address discrete factual issues bearing upon insurance coverage, an option that was suggested to us at oral argument by one of the insurance counsel. We also reject the related suggestion that the jury should answer special interrogatories on the verdict form resolving any additional factual disputes that relate to insurance coverage.

In order to provide meaningful responses to such insurance-related queries, the fact-finder presumably would want the benefit of the advocacy of counsel who are respectively seeking or opposing coverage. Such advocacy would call for insurance counsel to participate in the trial itself, to present and contest evidence, and to make closing arguments to the jury. The jury would therefore need to understand coverage counsel's role in the case and, presumably, the identities of their clients. That participation would undoubtedly risk speculation by jurors about the existence and levels of insurance coverage available to defendants. It could easily taint the jury's findings on negligence and the amount of any damages awarded. See N.J.R.E. 411 (generally excluding proof of liability insurance coverage in cases involving negligence or other wrongful conduct). There is also a real danger that the insurance coverage issues could

46

dominate the jury trial, thereby misdirecting the focus of plaintiff's negligence case.

We therefore limit our prescriptive holding to the participation of counsel who represent the parties on the issues of contractual indemnification (e.g., as between a general contractor or owner and a subcontractor). We do not endorse expanding the trial further to involve insurance issues or coverage counsel. The coverage issues must instead be decided by the court or, where a jury demand has been made by the insurers or the insureds, by a separate jury.

We recognize that the procedural solution we have endorsed is not perfect. Even so, we consider it the most superior of the possible alternatives, at least for cases such as the present one, involving a significantly greater scope than Kane. That said, the parties are free to stipulate to a different process, provided that the trial judge in his or her discretion finds such a proposed alternative sensible.

We suspect that, as a result of settlements with some parties and dispositive motion practice, the need for a combined tort/contractual indemnification trial may prove to be infrequent. In any event, we hope the direction that we have provided here will be useful in those future situations when they do arise. Although it is not our prerogative to do so, the Supreme Court may

47

also wish to revisit whether the approach in <u>Kane</u> should be followed in less complex settings.

<div align="center">B.</div>

Before we apply these principles to the trial that occurred here, certain threshold matters must be addressed to provide a proper context. We first consider Hugo Neu's indemnification agreements with, respectively, Femco and S&B, and the trial court's interpretation of those agreements.

<div align="center">1.</div>

In Femco's subcontract, it broadly agreed to indemnify Hugo Neu for "any and all claims . . . arising, or allegedly arising, from and out of (a) the work incident to or resulting from any and all operations performed by [Femco] under or pursuant to any of the provisions of [its subcontract]." Femco also agreed to indemnify Hugo Neu for claims arising out of "(b) any injury to, or death of, any person or persons . . . occurring wholly or in part in connection with or resulting from the work or by reason of any act, omission or negligence of [Femco][.]" Thirdly, Femco agreed to indemnify Hugo Neu for claims arising out of "(c) any breach or default hereunder by [Femco][.]" The subcontract specified that all three of these indemnity triggers apply, "whether or not any acts, errors, omission[s] or negligence of any

<div align="center">48</div>

of the [i]ndemnities [i.e., Hugo Neu] contributed thereto in whole or in part[.]"

The trial court correctly held this indemnity language in the Femco subcontract to be valid and enforceable. We further concur with the court that this contract language was sufficiently plain and unequivocal to require Femco to indemnify Hugo Neu for damages caused by Hugo Neu's own negligence. See Ramos, supra, 103 N.J. at 191-92 (requiring such provisions to be expressed in unequivocal terms); see also Azurak v. Corporate Prop. Investors, 175 N.J. 110, 112-13 (2003) (same).

We reject Femco's argument that the "whether or not" phraseology contained in the contract's indemnity provision created a fatal ambiguity that limits its obligation to indemnify Hugo Neu for its own negligence. Nor do we agree with Femco that the indemnity language here is internally inconsistent. The only limitation that applies stems from the statute, N.J.S.A. 2A:40A-1, precluding an enforceable duty to indemnify a party that is solely negligent, not applicable here.

In addition, we are unpersuaded by Femco's claim that the "arising . . . out of" phrase in the contract's indemnity language precludes Femco's duty to indemnify Hugo Neu for injuries that were not shown to be proximately caused by Femco's conduct. Applying a common and ordinary sense to that phrase, there only

49

needs to be proof of "a substantial nexus" between the injury and the activities encompassed in the contract. Vitty v. D.C.P. Corp., 268 N.J. Super. 447, 452-53 (App. Div. 1993); see also Leitao, supra, 301 N.J. Super. at 193.

For example, even if Hugo Neu were found partially negligent for an accident resulting to some extent from its failure to maintain the safety of a job site where Femco was working, the indemnification agreement would apply. That is because of the "substantial nexus" between the accident and the job site activities encompassed by the contract, unless, as we have said, Hugo Neu were found to be 100% responsible for the unsafe conditions.

2.

Hugo Neu's subcontract with S&B likewise contains broad indemnity language. Stripped to its essence, the indemnification clause provides that "[t]o the fullest extent permitted by law," S&B shall indemnify Hugo Neu "against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of [S&B's work under the contract], including, without limitation, any such claim, damage, loss or expense attributable to bodily injury, . . . caused by the acts or omissions of [S&B], . . . or anyone for whose acts they

50

may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by [Hugo Neu]."

This language clearly expresses that S&B must indemnify Hugo Neu against all claims "arising out of or resulting from performance of" S&B's work. The obligation applies, "regardless of whether or not such claim, damage, loss or expense is caused in part by [Hugo Neu]." The contract expressly identifies one subset of such claims for which S&B must indemnify Hugo Neu "without limitation," that is, claims for bodily injury caused by S&B's negligence, or the negligence of any party for which S&B is responsible.

Hence, under the clear and unambiguous terms of the indemnification clause, S&B must indemnify Hugo Neu for decedent's damages caused by Hugo Neu or S&B. As we have already noted with respect to Femco's similar provision, the phrase "arising out of" does not require a finding of proximate cause between a plaintiff's injury and S&B's work. Rather, it is sufficient that there is proof of a substantial nexus between the injury and S&B's work. Vitty, supra, 268 N.J. Super. at 452-53. So interpreted, decedent's injury here clearly "arose out of" his employer S&B's work under the contract, because it is undisputed that decedent was injured while performing such work.

51

The trial court therefore correctly granted partial summary judgment to Hugo Neu in ruling that S&B was obligated to indemnify Hugo Neu pursuant to their subcontract, so long as Hugo Neu was not found to be solely liable for the accident. We therefore reject S&B's cross-appeal of that determination.

3.

The indemnity issues are complicated here, however, by the fact that Hugo Neu bargained for duplicative indemnity protection from both Femco and S&B. Given that the accident had a substantial nexus to the work of Hugo Neu, Femco, and S&B, and did not arise wholly out of Hugo Neu's negligence, a question arises as to whether Femco or S&B has a primary duty to indemnify Hugo Neu, or whether those duties somehow should be equitably allocated, assuming that Hugo Neu seeks to enforce its rights under both indemnity agreements.[9] See, e.g., Chamison v. Healthtrust, Inc., 735 A.2d 912 (Del. Ch. 1999) (in which a corporation's director had a right to be indemnified by two separate indemnitors, and in which the court divided their indemnity obligations equally), aff'd, 748 A.2d 407 (Del. 2000).

---

[9] At oral argument on appeal, counsel for S&B asserted that Hugo Neu has "waived" its rights to seek indemnity from S&B. We have located no evidence of such a waiver in the parties' submissions. Indeed, Hugo Neu filed a brief opposing S&B's cross-appeal of the trial court's ruling obligating S&B to indemnify Hugo Neu.

Although the parties have not briefed these precise issues of overlap, it is conceivable that the relative shares of fault of Femco and S&B may bear upon their resolution.[10]  No such comparative findings were made by the jury here.  As we have already noted, the jury was not permitted to consider assigning a percentage share of fault to S&B.  We shall consider the consequences of that omission, infra, in Part III(C).

C.

Given the circumstances, the trial court justifiably allowed S&B's counsel to participate in this jury trial, despite the objections posed at the time by plaintiffs' counsel.  The issues of contractual indemnification relating to Femco, S&B, and Hugo Neu required several factual determinations, in which S&B surely had an interest.

These issues included whether Hugo Neu was solely at fault for the accident, in which case it would be entitled to no indemnity from either Femco or S&B under N.J.S.A. 2A:40A-1.  The issues also included whether Femco and S&B were each at fault, and, if so, to what extent, because those findings could bear upon the relative potential indemnity obligations to Hugo Neu of both

---

[10] We suspect that Femco and S&B have not squarely addressed this priority issue because they both incorrectly presume that they would need to be individually found at least partially at fault in order to have any duty to indemnify Hugo Neu.

53

S&B and Femco.  If, for instance, the jury found S&B to be faultless, or that S&B's share of fault were less than that of Femco, then Femco arguably might have had the paramount obligation to indemnify Hugo Neu.

The trial court declined, however, to include S&B on the verdict form and thereby allow the jury to "weigh in" on S&B's role, if any, in causing decedent's accident.  Such potential fault was not a fanciful possibility, as the evidence could have been reasonably viewed (consistent with certain opinions presented by some of the liability experts) to support a finding that S&B was negligent in allowing decedent, as its employee, to work in an area with an unsecured ladder it may have owned.

Citing our opinion in Kane, supra, the trial judge declined to place S&B on the verdict form out of an apparent concern that doing so would be inconsistent with the workers' compensation laws, and could unfairly interfere with plaintiffs' prosecution of their claims against the other defendants.  In this regard, the judge issued the following explanatory instruction to the jury:

> The plaintiffs may at some point have considered whether Simpson & Brown was negligent.  As to that issue, I have ruled, as a matter of law, that the plaintiffs cannot sue Simpson & Brown for negligence in this case because it is unquestioned that Simpson & Brown was Mr. D'Avila's employer and the law does not permit that lawsuit to take place. So you're not going to be asked to assess the

54

> responsibility of Simpson & Brown in this case.
>
> Simpson & Brown did participate in this case, as you know, but they participated for another issue which I, the Court, have to address later. It relates to a contract claim between Simpson & Brown and one or another of the construction defendants, and that's not for you to consider. Please don't speculate as to what that issue is.

Only counsel for S&B, Dr. Schrader, and Nurse Garcia opposed the omission of S&B from the verdict form.[11]

Notably, Femco itself never asserted a position to the trial court about the propriety of S&B's participation at trial, nor concerning S&B's inclusion or omission from the verdict form. Femco presented no argument on these subjects at the October 11, 2011 pretrial hearing, in the colloquy with the court when the issue arose again on October 19, 2011 before opening statements, or during the January 3, 2012 charge conference. Femco, which is now being represented by different counsel on appeal, does not explain why it was silent on this controversial subject before the trial judge, although we presume it had some strategic reason for being non-committal.

---

[11] Hugo Neu initially took the position before the trial began that S&B should be on the form. However, after the proofs were presented, Hugo Neu withdrew its objection at the charge conference, because its counsel had "shifted [his] focus" during the trial to the other defendants, given the court's previous indication before opening statements that S&B would not be on the verdict sheet.

For the reasons we have already noted in Part III(A), supra, the trial judge's reluctance to include S&B on the verdict form stemmed from legitimate concerns and a reliance upon our prior opinion in Kane. Moreover, as we have also shown, the state of law on this particular subject was muddled. Nevertheless, we conclude that the court erred in omitting S&B from the verdict form, having allowed S&B otherwise to participate fully in the trial and be represented by two separate counsel (one as to the job site accident and another as to the medical negligence claims). It was simply improper to allow S&B to participate in one manner without the other, and counsel have cited no authority endorsing such an arrangement.

That said, we now must consider what to do about the verdict form omission. Femco is the only party that is pressing the point on appeal, hypothesizing that its percentage share of liability might have been less had S&B been on the verdict form. S&B acknowledges the omission was error, but contends that it was harmless. Dr. Schrader, who had opposed S&B's omission, has settled with plaintiffs, and Nurse Garcia, who also opposed the omission, was not found liable. Plaintiffs, who had previously resisted S&B's participation, simply urge that we not upset the verdict or require them to participate in any second trial. Hugo

56

Neu also opposes a retrial, despite having initially favored S&B's inclusion on the verdict form when the issue arose before trial.

Notably, no party on appeal is arguing that Kane required S&B, as decedent's employer, to be excluded from this trial. In fact, the sole appellant that criticizes what occurred in the trial court, Femco, advocates just the opposite: that we repudiate "[t]he Kane court's admonition that an employer/indemnitor should not be permitted to participate in its employe[e]'s personal injury trial[.]" Citing Rule 4:30A (the single controversy rule), Femco further argues that Kane's approach "unnecessarily suppresses" the important "public policy in favor of disposing of all claims against all parties in one proceeding." Instead, Femco advocates that we adopt a more efficient approach that allows the employer to participate, but with appropriate "jury instructions that explain the parties' specific claims and how the jury may apportion fault." Hence, Femco urges that the unitary trial approach, sanctioned in White and mentioned in Bradford, be applied to cases such as the present one.

Given that Femco did not advocate —— either before or during the trial —— for S&B's inclusion on the verdict form, we do not perceive a manifest injustice to Femco that needs correction. We do not countenance a retrial of the entire case, which consumed almost forty days before a jury.

57

The "plain error" standard of review may be inapplicable here because the error of S&B's omission was "brought to the attention" of the trial court, albeit by other parties, see Rule 2:10-2. Even so, we are not convinced that Femco was sufficiently prejudiced by that error to compel a retrial.

With respect to Femco's now-resolved direct liability to plaintiffs, we discern no prejudice from S&B's omission from the verdict form. Femco's counsel strenuously advanced an "empty chair" theme against S&B at trial. That strategy apparently failed to persuade the jurors that Femco was blameless in the events leading up to the accident.

We are unpersuaded that the jury would have exonerated Femco, or would have been likely to find Hugo Neu more liable than the 25% allotted by the jury, had S&B been listed on the verdict form. There is no equitable or legally compelling reason here to require the entire case to be retried before a different jury, despite the improvident omission of S&B from the verdict form now belatedly being complained of by Femco. In Addition, Femco's recent settlement with plaintiffs, in which plaintiffs' judgment against Hugo Neu has been assigned to Femco, only strengthens the reasons for not burdening plaintiffs with additional proceedings.

A lesser remedy may, however, be appropriate, depending upon what Hugo Neu now intends to do with respect to its overlapping

58

rights of indemnification against Femco and S&B.  If Hugo Neu still intends to pursue indemnification from both subcontractors, pursuant to the terms of their contracts, a fact-based apportionment of fault between Femco and S&B might well be necessary to resolve their respective duties to indemnify.[12]

The jury trial unfortunately provided no guidance to compare Femco's and S&B's roles, respectively, in connection with the job site accident.  That comparison is not amenable to being resolved by our appellate review of transcripts from the jury trial, or by remanding the matter to the trial judge for a review of his trial notes.  Instead, the comparative relative percentages of fault of Femco and S&B —— assuming, arguendo, that they are needed to sort out the overlapping indemnity obligations of Femco and S&B —— cannot be fairly decided without testimony and credibility assessments.

---

[12] We do not resolve here whether the exclusive remedy mandate of N.J.S.A. 34:15-8, or related case law disallowing common-law contribution claims against a negligent employer, see Ramos, supra, 103 N.J. at 189, could affect the priority of duplicative duties to indemnify owed to Hugo Neu by both Femco and S&B.  We also do not resolve whether those authorities could affect whether Femco could obtain reimbursement from S&B of any sums it might pay to indemnify Hugo Neu.  These issues, conditional as they are in nature, have not been briefed.  If necessary, the trial court may consider them on remand, in light of any arguments raised by counsel.

A-4439-11T2

Should Hugo Neu, therefore, maintain its right to be indemnified by both Femco and S&B, then another proceeding may be required on remand to sort out the respective degrees of fault of Femco and S&B, as between one another. The percentage shares of Hugo Neu, Femco, and Dr. Schrader owed to plaintiffs shall remain undisturbed. The sole focus of such remand proceedings on the issues of contractual indemnity, if they are needed, shall be confined to a comparison of the actions and inactions of Femco with the actions and inactions of S&B.

Because Femco, S&B, and Hugo Neu each requested a jury trial in their pleadings, the remand proceedings shall be tried, if necessary, before a new jury, unless, of course, the parties consent to a bench trial. To reduce the costs involved and the burdens imposed on the other parties who are no longer involved in the case, counsel are encouraged to stipulate as much as possible to undisputed facts, and to consider agreeing to have much of the transcribed testimony from the first trial read into the record.

We emphasize that the scope of this second proceeding, if one is required, should be narrow. The damages awarded to plaintiffs shall remain unaltered, for the reasons noted, infra, in Part IV(A).

60

IV.

**[At the direction of the court, the published version of this opinion omits Part IV, which addresses additional claims of error relating to the jury trial raised by S&B and Femco.]**

V.

**[At the direction of the court, the published version of this opinion omits Part V, which addresses numerous issues raised on appeal by two of the insurance carriers, specifically C&F and American Home.]**

VI.

We have considered all of the other points raised on appeal by the various parties and conclude that they lack sufficient merit to be discussed in this opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION